1999 ME 120

**STATE of Maine**

v.

**Brad CHESNEL.**

Supreme Judicial Court of Maine.

Argued June 8, 1999.

Decided July 29, 1999.

*Beaulieu v. City of Lewiston,* 440 A.2d 334, 338 n. 4 (Me.1982).

Andrew Ketterer, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), Fernand Larochelle, Asst. Atty. Gen., Augusta, for State.

William Maselli (orally), Auburn, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and ALEXANDER, JJ.

ALEXANDER, J.

[¶ 1] Brad Chesnel appeals from the judgments entered in the Superior Court (Androscoggin County, *Delahanty, J.*) following a jury trial at which he was found guilty of murder in violation of 17–A M.R.S.A. § 201(1)(A) (1983)[1] and robbery (Class A) in violation of 17–A M.R.S.A. § 651(1)(E) (1983).[2] Chesnel contends that the trial court erred by: (1) denying his motion for a change of venue because of the publicity surrounding the homicide and a previous aggravated assault for which he pled guilty; (2) denying his motion to sever the trial; (3) denying his motion for a new trial based on assertions of juror misconduct; (4) failing to grant a mistrial when the prosecutor allegedly asserted personal opinions during closing arguments; and (5) admitting hearsay statements of the deceased. After review of the issues raised, we affirm.

---

**1.** Title 17–A M.R.S.A. § 201(1)(A) provides: "A person is guilty of murder if ... [h]e intentionally or knowingly causes the death of another human being ...."

**2.** Title 17–A M.R.S.A. § 651 provides:
 1. A person is guilty of robbery if he commits or attempts to commit theft and at the time of his actions:

. . . .

D. He intentionally inflicts or attempts to inflict bodily injury on another; or
E. He or an accomplice to his knowledge is armed with a dangerous weapon in the course of a robbery as defined in paragraphs A through D.

## I. CASE HISTORY

[¶ 2] On the morning of April 29, 1997, an employee of the Holiday Motel in Lewiston found the body of Michael Allen lying on the floor of a motel room. According to the Chief Medical Examiner, Dr. Henry Ryan, the cause of Allen's death was blunt head injury. Allen's jaw, nose, and facial bones were fractured and his face, hands, legs, and back contained abrasions and lacerations. In Dr. Ryan's opinion, the injuries were inflicted with a fist as well as with a steel weapon such as a tire iron.

[¶ 3] Chesnel and an acquaintance, Leroy Tomah, both admitted being present on April 28, when the fatal assault occurred. In conflicting statements, each accused the other of conducting the fatal attack. Both stated that following the attack, Chesnel took jewelry and other items from Allen's body. They then drove Allen's truck to Old Orchard Beach, where they abandoned the truck and disposed of the weapon and Allen's belongings. They rented a hotel room in Old Orchard Beach, stayed for an hour, then took a cab to a hotel near the bus station in Portland. The next morning they took a bus to California. After several days, Tomah contacted detectives in Maine and turned himself in to the police.

[¶ 4] Chesnel and Tomah were indicted on charges of robbery and murder in connection with Allen's death and were tried together in the Superior Court. The jury found both men guilty on both counts. Chesnel was sentenced to life in prison on the murder charge and 40 years on the robbery charge. Tomah was sentenced to 47 years on the murder charge and 14 years on the robbery charge. Each appealed their convictions. Tomah's conviction was affirmed, *State v. Tomah*, 1999 ME 109, 736 A.2d 1047.

## II. MOTION TO CHANGE VENUE

 [¶ 5] Pretrial publicity about a case will require a change of venue only where (i) the pretrial publicity is so extensive and pervasive that prejudice will be presumed, or (ii) actual prejudice is demonstrated. *See State v. Johnson*, 479 A.2d 1284, 1286 (Me.1984). Prejudice will be presumed where the pretrial publicity so taints the atmosphere surrounding the trial that a presumption of prejudice is necessary under due process principles. *See id.; see also Rideau v. Louisiana*, 373 U.S. 723, 724–26, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). To support a change of venue on presumption of prejudice grounds, a defendant must demonstrate "'intensive and extensive pretrial publicity of an invidious nature tending to arouse general ill will and vindictiveness against the accused.'" *State v. Cooper*, 617 A.2d 1011, 1014 (Me.1992) (quoting *State v. Addington*, 518 A.2d 449, 451 (Me.1986)).

 [¶ 6] Alternatively, to demonstrate actual prejudice on the part of the jury venire, the focus is not on the number of jurors who know of the case or the ratio of the jurors who know of the case to the panel as a whole, but the impartiality of the available panel members, with review for an abuse of discretion. *See State v. Corson*, 572 A.2d 483, 485 (Me.1990); *Johnson*, 479 A.2d at 1287–88.

 [¶ 7] In support of his efforts to change venue, Chesnel produced copies of thirteen articles from Lewiston newspapers. Four of the articles appeared in July and August of 1996 and discussed a beating that occurred in Sabattus with a hammer and the search for, and apprehension of, Chesnel and a codefendant in connection with the beating. The remaining nine articles appeared between April and June of 1997 and discussed the Allen homicide, the search for, and apprehension of, Chesnel and Tomah in connection with the homicide, and references to the victims of the earlier hammer attack in Sabattus in which Chesnel had participated. Looking at the articles as a whole, they were published over an extended period of time, the most recent approximately eight months before jury selection, and they did not call for specific action or express opinions as to guilt. They cannot be said in total to constitute pretrial publicity with the imme-

diacy, the intensity, or the invidiousness sufficient to arouse general ill will and vindictiveness against the accused at the time of the jury selection. *See State v. Clark,* 386 A.2d 317, 319–20 (Me.1978); *State v. Littlefield,* 374 A.2d 590, 593–594 (Me.1977). Therefore, prejudice per se or presumed prejudice is not demonstrated.

■ [¶ 8] With respect to the issue of actual prejudice, the record reflects that the trial court extensively examined jurors about their knowledge of the case. In this inquiry, the trial court included questions requested by the defense. Further, the trial court gave the defense the opportunity to suggest additional questions and, ultimately, the defense did not suggest any more questions. After challenges for cause were exercised, with the court granting most of the defense's challenges for cause, a panel of 63 jurors remained, whom the trial court determined could be impartial. A total of only 48 jurors were needed to pick a jury, considering the number of peremptory challenges which had been allowed.[3] All jurors ultimately chosen to serve asserted that they could remain impartial.

[¶ 9] Given the large number of jurors that were available for selection after questioning and the exercise of challenges for cause, Chesnel has not demonstrated actual prejudice in the jury panel or that the trial court abused its discretion in denying his motion to change venue. *See Corson,* 572 A.2d at 485.

## III. MOTION TO SEVER TRIALS

■ [¶ 10] Prior to trial, Chesnel filed a motion to sever his trial from that of the codefendant, Tomah. The grounds for the motion appear to be (i) the anticipated

offering by the State of statements by Tomah, and (ii) the anticipated antagonistic defenses of the two defendants. Tomah objected to Chesnel's motion to sever. After a hearing, the court denied Chesnel's motion to sever, "provided that any statements attributable to defendant Tomah offered by the State or by Tomah during the State's case in chief shall be redacted to apply only to the conduct of defendant Tomah."

[¶ 11] From the record, it does not appear that the statement to which the trial court's concern was directed was ever presented by the State. Further, as Tomah testified at trial and was subject to cross-examination, any *Bruton*[4] problems, were effectively avoided. *See State v. Drake,* 1999 ME 91, ¶ 9, 731 A.2d 858.

■ [¶ 12] Chesnel also argued that the antagonistic defenses which the defendants would offer justified severance. An allegation that two codefendants will present antagonistic defenses and point the finger at each other is not sufficient to require severance of a joint trial. *See Zafiro v. United States,* 506 U.S. 534, 538–40, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). In *Zafiro,* the United States Supreme Court faced a similar case where a defendant was seeking severance on the grounds that each defendant claimed innocence and would accuse the other of the crime. *See id.* at 539–40, 113 S.Ct. 933. The Court did not find prejudice in that situation, reasoning that a defendant is not entitled to severance just because a defendant is more likely to receive an acquittal through a separate trial. *See id.* at 540–41, 113 S.Ct. 933. The Court noted that any risk of prejudice could be cured by

---

3. In a murder case, both the prosecution and the defense are entitled, at a minimum, to ten peremptory challenges, *see* M.R.Crim. P. 24(c)(3), plus one challenge to alternates, *see* M.R.Crim. P. 24(d). Thus, a minimum of 36 jurors would have been needed to select a murder jury with two alternates. In this case, the court exercised its discretion and allowed 48 challenges, which is more than the mini-

mum required by the rule. Rule 24(c)(2) notes that: "If there is more than one defendant, the court may allow the defendants additional preemptory challenges, permit the challenges to be exercised separately or jointly, and determine the order of the challenges."

4. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

instructions to the jury that they must separately determine each defendant's guilt beyond a reasonable doubt. *See id.* Here, the trial court properly instructed the jury as suggested by *Zafiro.*

[¶ 13] A trial court's grant or denial of a motion to sever a trial of two defendants is reviewed for abuse of discretion. *See State v. Johnson,* 472 A.2d 1367, 1370 (Me.1984). In determining whether to grant a motion to sever, the trial court " 'must balance the general policy in favor of joint trials against the prejudice to a defendant which may result.' " *State v. Boucher,* 1998 ME 209, ¶ 9, 718 A.2d 1092, 1094 (quoting 1 Cluchey & Seitzinger, *Maine Criminal Practice* § 8.9 at III–65 (1995)). The trial court did not abuse its discretion in denying Chesnel's motion to sever.

## IV. ASSERTIONS OF JUROR MISCONDUCT

### A. Juror Contact History

[¶ 14] After the jury panel was questioned about their knowledge of "the case" and whether they could be impartial, some jurors were asked individual follow-up questions, and some jurors were excused for cause. Then in a side bar discussion, counsel for Chesnel asked the court to question the panel further as to any details of news reports they recalled, leading to the following discussion:

> (Counsel for Chesnel): I would also ask if any of the jurors are familiar with media reports involving any details concerning Mr. Chesnel or Mr. Tomah related to any topic which really picks up from the other case,[5] because the question you asked . . . .
>
> (The Court): Do you want to open the door to that?
>
> (Counsel for Chesnel): I don't want to mention another case. I just want to say do you recall anything relating to

Mr. Tomah or Mr. Chesnel relating to anything whatsoever.

> (The Court): Okay.

[¶ 15] To accommodate the defense's request, the court first asked a follow-up question as to whether any of the jurors who had indicated that they had heard something about "the case," recalled any of the details of the case. To this question, one juror responded affirmatively. Following the question about "the case," the court then asked:

> And is there any member of the jury panel, ladies and gentlemen, who may recall reading anything in the newspaper or hearing anything on the news concerning either of the defendants, either concerning this case or any other reason?

No jurors responded to this question.

[¶ 16] The court then proceeded to ask jurors about issues unrelated to their knowledge of the case or the defendants, such as whether any jurors possessed a law enforcement background. At the conclusion of these questions, the court again asked counsel if there were any additional questions they wished the court to ask the jury. Counsel for the State and for both defendants responded in the negative. Following the court's consideration of more challenges for cause, counsel for Chesnel renewed the motion for a change of venue, which the court denied. The jury was then selected. After each counsel exercised peremptory challenges, the court asked if counsel were satisfied with the jury as constituted, to which all three counsel replied: "Yes, your honor." [6]

[¶ 17] After the trial and the guilty verdicts, counsel for Chesnel sent a private investigator to find and interview the trial jurors in an attempt to find evidence of prior knowledge of the murder or the attack occurring in Sabattus. The defense

---

**5.** The "other case" refers to the 1996 Sabattus assault case.

**6.** This question is best asked at side bar, or in another place out of the presence of the jury,

so that counsel who may have an objection do not have to state dissatisfaction with the selected jury in front of the jury if they want to preserve an issue for review.

actions were what might be characterized as a "fishing expedition" since, as counsel acknowledged at oral argument, he had no prior indication of juror misconduct.

[¶ 18] As a result of contacts with jurors identified in the record as A, B, and C, the private investigator reported as follows:

> 1. Juror A advised that, during the jury's deliberations, he had heard Juror B make a statement regarding Chesnel that was not part of the trial testimony. Juror A stated that he did not recall exactly what Juror B had said.
>
> 2. Juror B stated that he was aware of the details of the assault occurring in Sabattus involving Chesnel as they were recounted in the newspapers prior to the trial. The investigator also asserted that Juror B expressed "considerable remorse" that he had not informed the court of this knowledge prior to the trial.
>
> 3. Juror C asserted that during the course of jury deliberations, Juror B had said: "(Chesnel) is perfectly capable of something like that. He did the same thing in Sabattus with a hammer."

[¶ 19] Chesnel filed a timely motion for a new trial,[7] supported by affidavits from his private investigator about the statements the investigator claimed the jurors had made to him. A hearing on the motion for a new trial was scheduled at which the involved jurors were subpoenaed to appear. After hearing arguments but no testimony, the court, citing M.R. Evid. Rule 606(b), denied the motion for a new

trial. In its ruling, the court stated that the law "does not permit the verdict of the jury to be impeached by the testimony of the jurors themselves as to what took place in the jury room during their deliberations."

[¶ 20] After the court's ruling and while this appeal was pending, counsel for the State asked us to stay the appeal and remand the case to the trial court to reopen the matter and take testimony from Juror B to properly determine (i) Juror B's alleged knowledge of the prior attack, and (ii) whether Juror B had improperly failed to respond to the court's voir dire questions regarding knowledge of the defendants. Defense counsel objected to this request, preferring to leave the record as it existed.[8] We denied the stay, the trial court took no further action, and the matter is now before us on appeal on the present record.

## B. Juror Contact Discussion

[¶ 21] The prohibition against the use of jurors' testimony to impeach their own verdict or disclose the basis for their deliberations or decisions long predates codification of the rule in Rule 606(b) of the Maine Rules of Evidence[9] and the Federal Rules of Evidence. "It is the general rule since Lord Mansfield's time that the testimony of a juror is not available to impeach a verdict in which he participated." *Patterson v. Rossignol,* 245 A.2d 852, 856 (Me. 1968).

---

7. M.R.Crim. P. Rule 33 requires that motions for new trials regarding jury misconduct be filed within ten days of the verdict. *See State v. Sabattis,* 602 A.2d 671, 672 (Me.1992); *State v. Gatcomb,* 478 A.2d 1129, 1131 (Me. 1984).

8. The record does not include documentation of the defense's objection to the State's request. The objection, however, was acknowledged by both parties at oral argument.

9. M.R. Evid. 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring

during the course of the jury's deliberations or to the effect of anything upon that juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning any juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

[¶ 22] We have repeatedly stated the public policy considerations against permitting jurors to impeach their own verdicts:

(1) the need for stability of verdicts; (2) the need to conclude litigation and desire to prevent any prolongation thereof; (3) the need to protect jurors in their communications to fellow jurors made in the confidence of secrecy of the jury room; (4) the need to save jurors harmless from tampering and harassment by disappointed litigants; (5) the need to foreclose jurors from abetting the setting aside of verdicts to which they may have agreed reluctantly in the first place or about which they may in the light of subsequent developments have doubts or a change of attitude.

*Taylor v. Lapomarda,* 1997 ME 216, ¶ 8, 702 A.2d 685, 688 (citing *Patterson,* 245 A.2d at 857).

 [¶ 23] While M.R. Evid. Rule 606(b) does not prohibit post-verdict contacts with jurors and M. Bar Rule 3.7(f)(2)[10] permits such contacts subject to certain conditions, the usefulness of such

10. M. Bar. R. 3.7(f) provides:
 (1) At no time shall a lawyer connected with the trial of a case communicate extrajudicially, directly or indirectly, with a juror, with anyone the lawyer knows to be a member of the pool from which the jury will be selected, or with any member of such person's family.
 (2) After discharge of a juror from further jury service, a lawyer may ask or answer questions and make comments to the former juror provided the questions or comments are not intended to harass or embarrass the juror or influence the juror's action in future jury service.
 (3) A lawyer shall reveal promptly to the court knowledge of improper conduct by a juror or member of the jury pool, or by another toward a juror or member of the jury pool, or a member of the juror's or jury-pool member's family.

11. M. Bar Rule 3.7(f) was adopted as part of the original adoption of the Bar Rules in 1978. The advisor's notes to Rule 3.7(f) state that "Rule 3.7(f) is a restatement of DR7–108. No substantive change is intended." Maine Reporter, 396–400 A.2d at LXXXVII (1979). DR7–108 refers to the section of the American Bar Association Code of Professional Respon-

contacts in efforts to impeach verdicts is narrowly circumscribed. "[A] court may not inquire into the substance of the jury's deliberations." *State v. Coburn,* 1999 ME 28, ¶ 7 n. 3, 724 A.2d 1239, 1242 n. 3. Juror testimony "may be offered only to show 'external misconduct of individual jurors' or 'the exertion of outside influence' upon the jury." *Marr v. Shores,* 495 A.2d 1202, 1204 (Me.1985).

 [¶ 24] With similar ethical rules in effect,[11] our past decisions have been critical of efforts by defeated litigants to contact jurors and seek information about their deliberations in hope of impeaching the verdict. In *Patterson,* defeated counsel contacted a juror who had changed her vote between two jury polls in a civil case, which, at that time, required a unanimous verdict. *See* 245 A.2d at 855. Counsel reported that the juror had said she changed her vote because of alleged improper coercion from the jury foreman. *See id.* In refusing to consider the juror statement in support of the effort to overturn the verdict, the court noted:

sibility which previously governed conduct of Maine attorneys, enforced through actions of the Maine State Bar Association. At the time of the *Patterson* decision, DR7–108 provided:

(D) After discharge of the jury from further consideration of a case with which the lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury that are calculated merely to harass or embarrass the juror or to influence his actions in future jury service.
(E) A lawyer shall not conduct or cause, by financial support or otherwise, another to conduct a vexatious or harassing investigation of either a venireman or a juror.
(F) All restrictions imposed by DR7–108 upon a lawyer also apply to communications with or investigations of members of a family of a venireman or a juror.
(G) A lawyer shall reveal promptly to the court improper conduct by a venireman or a juror, or by another toward a venireman or a juror or a member of his family, of which the lawyer has knowledge.

Her ill considered statements were not volunteered but were made to defeated counsel upon his abusive invasion of her privileged status as a juror and undoubtedly given under the mistaken idea that she owed him a duty of explanation. Such conduct by counsel is a serious impediment to the administration of justice, causes jurors great embarrassment and harassment, has the natural tendency to prevent free expression of thoughts amongst jurymen in their deliberations and is an effective deterrent to a willing acceptance of jury service.

In *Greeley v. Mansur*, supra,[12] our Court has said that '[i]t is therefore useless for parties or their counsel, to interrogate jurors with respect to their verdicts, in the hope thereby to obtain evidence on which to ground a motion for a new trial. Such efforts will not avail.' This statement was repeated in *Trafton v. Pitts*, supra.[13]

We now condemn the practice, not only as a useless gesture, but as undesirable and highly unethical and improper. Jurors must receive court protection against private investigations by defeated counsel unless the purpose thereof be to establish proof of external misconduct of individual jurors or of the existence of an outside influence which our Court has recognized as an exception to the rule of exclusion.

245 A.2d at 857–58. Under the current rules, evidence obtained from juror contacts can only be used to impeach a jury verdict if the evidence reveals that the jury was subject to "extrajudicial prejudicial information" or "outside influence." *See* M.R. Evid. 606(b); *Marr*, 495 A.2d at 1204.

[¶ 25] Many jurisdictions go even further in proscribing post-verdict juror contacts, and "require a threshold showing of good cause, or the explicit prior approval of the court before attorneys may interview jurors." [14]

▇▇▇ [¶ 26] We do not encourage or suggest approval of post-verdict contact with jurors, seeking information with which to impeach the verdict, where such

---

12. 64 Me. 211 (1874).

13. 73 Me. 408 (1882).

14. Benjamin M. Lawsky, *Limitations on Attorney Post Verdict Contact with Jurors: Protecting the Criminal Jury and Its Verdict at the Expense of the Defendant,* 94 Colum. L.Rev. 1950, 1951 (1994); *see also* Note, *Public Disclosures of Jury Deliberations,* 96 Harv. L.Rev. 886, 888, 889 (1983): "Trial judges have long tried to insulate jurors from 'harassment,' 'molestation,' 'ransacking,' and 'intimidat[ion]' by prying counsel and others. This protectiveness is not simply the product of regard for the jurors in the case at hand: courts are also influenced by the notion that failure to shield current jurors from unwanted scrutiny will cause other citizens to shun jury duty in the future. In these days of courtroom cameras, however, there may be no practical way to preserve complete privacy for publicity-shy jurors in 'big cases.'" (Footnotes omitted.)

As an example of the practice in one State, Florida Bar Rule 4–3.5(d)(4) prohibits contact with jurors after dismissal of the jury except to determine whether the verdict may be subject to legal challenge. Even for this purpose, however, jurors may not be interviewed "unless the lawyer has reason to believe that grounds for such challenge may exist[.] ... [B]efore conducting any such interview the lawyer must file in the cause a notice of intention to interview setting forth the name of the juror or jurors to be interviewed. A copy of the notice must be delivered to the trial judge and opposing counsel a reasonable time before such interview." Fla. Bar Rule 4–3.5(d)(4). Similarly, Florida Rule of Civil Procedure 1.431(h) sets forth a preliminary procedure to be followed if a party believes that grounds for a legal challenge to a verdict exist and wants to interview a juror. Enforcing these rules, Florida courts have held that evidence of juror misconduct obtained by direct contacts with jurors without first obtaining an order allowing interviewing of jurors upon demonstrating appropriate cause will not be considered. *See Seymour v. Solomon,* 683 So.2d 167, 168 (Fla.Dist.Ct.App.1996); *Walgreens, Inc. v. Newcomb,* 603 So.2d 5, 6 (Fla.Dist.Ct.App.1992); *see also* Craig B. Willis, *Juror Misconduct: Balancing the Need for Secret Deliberations with the Right to a Fair and Impartial Trial,* 72–May Fla. B.J. 20, 24 (1998). ·

contacts are initiated without any cause to believe that improprieties occurred. Certainly, we could not vacate a conviction solely upon a defeated litigant's affidavit as to what he claims jurors may have said. We have no basis to determine the veracity of such statements or the circumstances in which they were made. To some jurors, a post-verdict contact by a convicted murderer's agent may be an event of particular stress and fear. Such contacts may or may not invite accurate responses that recount events as they occurred. Instead, because of the difficult position in which a juror is placed, such contact may invite statements which the contacted juror may think necessary to satisfy the agent.

[¶ 27] The most action we could take, in the present context, is to remand the matter to the trial court for a hearing to determine the facts as to (i) whether Juror B may have had knowledge which, during voir dire, he knew he should disclose and did not disclose, (ii) the circumstances under which the defendant's agent contacted the jurors, and (iii) the representations the agent made to the jurors. The State urged the defense to join in pursuing an opportunity to obtain just such a hearing, at least with respect to Juror B's knowledge at the time of the voir dire, but the defense declined the opportunity, preferring to bring the matter forward for appeal on the available record.

 [¶ 28] The appellant has the burden and the responsibility to ensure that the record on appeal is sufficient to permit us to assess adequately each claim of error. *See Cooper,* 617 A.2d at 1014; *Addington,* 518 A.2d at 451; 2 Cluchey & Seitzinger, *Maine Criminal Practice* § 39.1 at VII–128 (1995). Accordingly, declining an opportunity to improve the quality of information available for review is not likely to be a successful tactic in appellate advocacy.

 [¶ 29] Rule 606(b) would permit the trial court to inquire about whether Juror B knew of information about Chesnel that, upon inquiry during voir dire, he knew he should disclose and did not disclose. *See Clark v. United States,* 289 U.S. 1, 9–12, 53 S.Ct. 465, 77 L.Ed. 993 (1933). A post-trial hearing would be the appropriate forum in which the accuracy of a juror's voir dire response and potential bias can be explored. *See* Robert G. Loewy, *When Jurors Lie: Differing Standards for New Trials,* 22 Am. J.Crim. L. 733, 737 (1995). To obtain a new trial on an allegation that a juror did not accurately answer a voir dire question, a party must demonstrate that (i) the juror failed to honestly or correctly answer a material question, and (ii) a correct response would have provided a valid basis for a challenge for cause. *See McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *Grover v. Minette–Mills, Inc.,* 638 A.2d 712, 715 (Me. 1994). A new trial would be ordered only if the nondisclosure prevented the discovery of juror bias as probably, not speculatively existent. *See Eckenrode v. Heritage Management Corp.,* 480 A.2d 759, 764–65 (Me.1984) (citation omitted).

[¶ 30] Here, after many questions referring to "the case" had been asked, the court asked a question as to whether any of the jurors recalled anything in the news "concerning either of the defendants, either concerning this case or any other reason." Even assuming that the reported statements made to the private investigator were accurate and given in a noncoercive context, they do not establish a dishonest or incorrect answer. The voir dire question was very vague. No more specific questions were sought by defense counsel such as: "Other than information about this case, have you heard or read anything else about Mr. Chesnel?"

[¶ 31] In examining whether inaccurate responses to voir dire questions justify a new trial, one writer has observed that:

> [All] states require that defendants and their lawyers exercise "due diligence." Essentially, this means that defendants will not be allowed to raise on appeal any error that could have been corrected at the trial level. The rule has two main

applications in practice. First, the lawyer must ask specific questions during voir dire designed to elicit the concealed information from the prospective juror. Second, defendants and their lawyers must immediately notify the court of any evidence they have, or should have, concerning the validity of the juror's responses.

Loewy, *When Jurors Lie: Differing Standards for New Trials,* 22 Am. J.Crim. L. at 744. The question posed here does not meet the specificity requirement. It is not sufficiently clear that Juror B's—and all the other juror's—nonanswer is apparently a dishonest or incorrect answer to the question in the context in which it was asked. On the present record, there is an insufficient basis to find that Juror B incorrectly or dishonestly answered the very vague question posed. Without a sufficient record to indicate that a juror improperly answered a voir dire question, there is no other basis to inquire into the substance of the jury's deliberations. Chesnel's attempt to impeach the jury verdict by suggesting juror misconduct fails.

## V. OTHER ISSUES

[¶ 32] Chesnel contends that at several times during closing argument, counsel for the State improperly asserted personal opinions on the issues. No objections were made at these times during the closing argument. Thus, we must review the State's closing remarks for obvious error. *See* M.R.Crim. P. 52(b). "Error is obvious only when it is so highly prejudicial and so taints the proceedings as virtually to deprive the defendant of a fair trial." *State v. Pelletier,* 673 A.2d 1327, 1330 (Me.1996). While counsel needlessly risks claims of improper uses of personal opinion any time they personalize closing argument with terms such as "I" or "my," none of the statements which the defense singles out rise to the "highly prejudicial" level for obvious error review.

[¶ 33] Chesnel's counsel also objected to certain testimony of witnesses who were with Michael Allen. The testimony described statements by Allen during and after a phone call which Allen received immediately prior to leaving their presence for the apparent purpose of meeting Chesnel and Tomah. Some of the statements at issue may have been hearsay, but any error in their admission was harmless, *see* M.R.Crim. P. 52(a), as the statements did not relate to issues seriously in dispute after Chesnel's testimony. Specifically, the statements have no relation to the question of who was the principal actor causing Allen's death. No substantial rights were affected by the admission of this evidence.

The entry is:

Judgments affirmed.

