2003 ME 79
**STATE of Maine**
v.
**Steven BARNARD.**

Supreme Judicial Court of Maine.

Argued: Oct. 7, 2002.
Decided: June 18, 2003.

G. Steven Rowe, Attorney General, James M. Cameron, Asst. Attorney General (orally), Matthew Erickson, Asst. Attorney General, Augusta, for State.

Carol J. Lewis (orally), Lubec, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Steven Barnard appeals from a judgment entered after a jury trial in Superior Court (Washington County,' Marden, J.) convicting him of aggravated trafficking in scheduled drugs (Class A), 17–A M.R.S.A. §§ 1103, 1105(1)(E), (2) (1983 & Supp.2002).[1] On appeal, Barnard contends that (1) the jury instructions regarding a laboratory analysis certificate constituted obvious error; (2) the evidence was insufficient to find that he trafficked within 1000 feet of the real property of a school; and (3) his sentence reflected a misapplication of principle. Finding no error, we affirm.

## I.  CASE HISTORY

[¶ 2] The trial record, viewed in the light most favorable to the State, establishes the following facts: On March 29, 2001, a confidential informant, working with Agent Richard Rolfe of the Maine Drug Enforcement Agency (MDEA), made a controlled purchase of two pills from Barnard in the living room of Barnard's apartment in a multi-unit apartment building on the corner of North Street and Main Street in Calais. A subsequent analysis by the Maine State Crime Laboratory certified that the tablets contained hydromorphone, otherwise known as Dilaudid, a schedule W drug. See 17–A M.R.S.A. § 1102(1)(I).

[¶ 3] Trafficking in schedule W drugs is a Class B crime. Id. § 1103(2)(A). When occurring "within 1000 feet of the real property of" a school the offense becomes aggravated trafficking, a Class A crime. Id. § 1105(1)(E), (2). Barnard was charged with aggravated trafficking in schedule W drugs, a jury trial was held on December 11, 2001, and the court declared a mistrial because the jury deadlocked.

[¶ 4] A second jury trial was held on January 8, 2002. The evidence established that on March 29, 2001, MDEA agents dropped off the confidential informant near Barnard's apartment building to make the controlled drug buy. The confidential informant entered the building from a rear entrance. He walked up an internal flight of stairs, knocked on the door of Barnard's apartment, entered the apartment, and purchased the pills from Barnard in the living room.

[¶ 5] Barnard's apartment building is on the same side of North Street as the Calais Middle School. The school is at the intersection of North Street and Washington Street. The apartment building is at the intersection of North Street and Main Street. To prove that Barnard's trafficking occurred within 1000 feet of the school, the State had Agent Rolfe draw a chalkboard diagram depicting the school property and intervening structures on North

---

1. Section 1105 was repealed effective January 31, 2003, and replaced by 17–A M.R.S.A. § 1105–A (Supp.2002).

Street up to Barnard's apartment building.[2] On the chalkboard, the school property was marked with a letter "C" and Barnard's apartment was marked with a letter "B." Agent Rolfe then testified that, using a roller tape, "I measured from the grass of the middle school property all the way to Main Street," referring to Main Street as depicted on the diagram. The State then asked "What was the distance that you measured between the property of the Calais Middle School and to the far end of that building?" Rolfe replied: "757 feet, 4 inches."

[¶ 6] The use of the chalkboard was supplemented by a photograph showing the grassy corner of the middle school property, also marked "C" and, along North Street, Barnard's apartment building, marked "B." Barnard's apartment building is difficult to locate in the photograph, but its location is confirmed by the traffic light standards close to the building at the intersection of North and Main Streets. These standards appear in the State's photograph and a separate photograph of the front of the apartment building, introduced by the defense.

[¶ 7] Agent Rolfe's testimony indicated that his knowledge of the school property was based upon his long-time residence in the area, numerous visits to the school, and use of the school property. The confidential informant also testified that the grassy area was school property, based on his attendance at the school as a child: "I went to school there, we used it, played

kick ball and soccer on that, actually, edge of the field of the Calais Middle School. I do know it is part of the Calais Middle School."

[¶ 8] There was no evidence of the distance from the Main Street corner of Barnard's apartment building to the location within the building where the drug sale occurred. The evidence indicated that Barnard's apartment was one of only four units on the third floor of the front section of the apartment building. Photographs of the front and back of the building would permit a jury to reasonably conclude that no dimension of the third floor portion of the building was greater than seventy-five feet. The dimension judgment could be made by the jury employing its common knowledge to compare the size of the pictured vehicles parked in front of the building to the size of the building itself. Based on the photographs, the chalkboard diagram, and the testimony, the jury could conclude that: (1) the apartment building faced squarely onto North Street; (2) its side walls extended away from North Street at ninety degree angles; and (3) the far, or Main Street, wall of the apartment building was on a plane parallel to the school property.

[¶ 9] To prove that the pills that Barnard sold to the confidential informant were schedule W drugs, the State offered a laboratory analysis certificate, signed by a certified chemist, showing that the tablets contained hydromorphone.[3] In addition, both Agent Rolfe and the confidential

---

2. Although it was important to Agent Rolfe's description of the relationship between the school property and Barnard's apartment, the chalkboard was not preserved for the record.

3. A properly certified laboratory analysis certificate is admissible in evidence and, at the time of trial, was considered "prima facie evidence" of the composition, quality, and quantity of the drug stated in the certificate

unless the defense, with ten days notice to the prosecution, requests a qualified witness to testify regarding the drug analysis. 17–A M.R.S.A. § 1112(1) (Supp.2002). Effective January 31, 2003, section 1112(1) was amended to strike the reference to "is prima facie evidence" and substitute the term "gives rise to a permissible inference," citing M.R. Evid. 303. P.L.2001 ch. 383 § 142.

informant testified that they were familiar with Dilaudid and that the pills appeared to be Dilaudid.

[¶ 10] Following the close of the State's case, the court denied Barnard's motion for judgment of acquittal, which Barnard unsuccessfully renewed following the close of all evidence. As part of instructions, the court instructed the jury regarding the certificate as follows:

> Now, one final bit of evidence—of instruction with respect to the evidence on the first part of this, and that is you have an exhibit which is a certificate from the laboratory in Augusta. And I instruct you, as a matter of law, that this certificate is sufficient to prove the results of the laboratory examination as it is stated on the certificate. It is up to you to find, from all the evidence, including *the exhibit or the certificate*, whether it has been proven beyond a reasonable doubt that the pills alleged to have been sold in this instance were Hydromorphone.

Barnard did not object to this instruction.

[¶ 11] The jury found Barnard guilty of aggravated trafficking in scheduled drugs. The court sentenced Barnard to six years imprisonment, with all but five years suspended, followed by two years of probation. Barnard filed an appeal from his conviction. In addition, the Sentence Review Panel granted him leave to appeal his sentence based upon his claim that the court, when sentencing him, misapplied the statutory three-part analysis when sentencing him. 17-A M.R.S.A. § 1252-C (Supp.2002).

## II. LEGAL ANALYSIS

A. Jury Instruction Regarding Chemical Analysis Certificate

[¶ 12] Barnard contends that the court's jury instruction regarding the chemical analysis certificate constituted obvious error because it gave the jury the impression that the certificate was conclusive, rather than prima facie, evidence of the composition of the drug. From this, argues Barnard, the jury may have thought that the State had no burden of proof regarding the composition of the pills that Barnard sold. The State concedes that the instruction may have been confusing, but asserts that this was harmless because Barnard never contested the composition of the pills.

[¶ 13] Barnard did not object to the jury instructions given by the trial court, therefore, we review those instructions only for obvious error. M.R.Crim. P. 52(b); *State v. Small*, 2000 ME 182, ¶ 5, 763 A.2d 104, 105. "We will not grant relief unless the error in the instructions is so highly prejudicial and so taints the proceedings as to virtually deprive the defendant of a fair trial." *Id.* Further, we review jury instructions "as a whole, taking into consideration the total effect created by all the instructions and the potential for juror misunderstanding." *State v. Saucier*, 2001 ME 107, ¶ 23, 776 A.2d 621, 627–28 (quoting *State v. Cote*, 462 A.2d 487, 490 (Me.1983)).

[¶ 14] At the time Barnard was tried, requirements for drug analysis certificates and their prima facie evidentiary value were set by statute as follows:

> A laboratory that receives a drug or substance from a law enforcement officer or agency for analysis as a scheduled drug shall, if it is capable of so doing, analyze the same as requested by a method designed to accurately determine the composition of the substance, including by chemical means, visual examination, or both, and shall issue a certificate stating the results of the analysis. The certificate, when duly signed and sworn to by a person certified as

qualified for this purpose by the Department of Human Services under certification standards set by that department, is admissible in evidence in a court of the State, and is prima facie evidence that the composition, quality and quantity of the drug or substance are as stated in the certificate.... 

17–A M.R.S.A. § 1112(1) (Supp.2001) (amended by P.L.2001, ch. 383, § 142, effective January 31, 2003).

[¶ 15] Where a criminal statute establishes that certain evidence carries prima facie weight, courts must instruct jurors in terms of "reasonable inferences" that the jurors are free to accept or reject from the evidence. M.R. Evid. 301(b) (stating that a statute providing that a fact is prima facie evidence of another fact establishes a presumption); M.R. Evid. 303(c) (stating that in criminal cases, court should instruct in terms of reasonable inference, not presumption);[4] *State v. Liberty,* 478 A.2d 1112, 1116–17 (Me.1984) (stating that it is error to instruct jury in terms of a presumption); *State v. Raymond,* 399 A.2d 223, 223 (Me.1979); *Maine Jury Instruction Manual* § 6–13 (4th ed.2003). The current version of section 1112(1) better reflects Maine law: "The certificate ... gives rise to a permissible inference under the Maine Rules of Evidence, Rule 303 that the composition, quality and quantity of the drug or substance are as stated [in the certificate] ...." 17–A M.R.S.A. § 1112(1) (Supp.2002).

[¶ 16] The court's instruction that "as a matter of law ... this certificate is sufficient to prove [that the pills contained hydromorphone]," standing alone, could have the effect of misleading the jury regarding the legal significance of the certificate. To avoid confusion, an instruction to a jury in a criminal case must avoid terms such as "prima facie evidence" or "presumption," and use instead the terms "inference" or "permissible inference." *Liberty,* 478 A.2d at 1116–17; M.R. Evid. 303(c). The jury should also be instructed that any inference does not shift the burden of proof, and that they are not bound to accept any inference and may reject it. *Maine Jury Instruction Manual* § 6–13; *State v. Christianson,* 404 A.2d 999, 1003 (Me.1979).

[¶ 17] The portion of the instruction that "as a matter of law" the certificate was sufficient to prove that the pills contained hydromorphone cannot be analyzed in isolation from the remainder of the instruction. The next sentence of the court's instruction put the certificate back into its proper perspective: "It is up to you to find, from all the evidence, including the exhibit or the certificate, whether it has been proven beyond a reasonable doubt that the pills alleged to have been sold in this instance were Hydromorphone." Taken together, these statements informed the jurors that it was up to them to determine from all of the evidence whether the composition of the pills was proven beyond a reasonable doubt.

[¶ 18] In measuring whether the instruction was so highly prejudicial as to virtually deprive the defendant of a fair trial, we also consider the extent to which the analysis of the pills was in dispute. Here,

---

4.  M.R. Evid. 303(c) states:

    **Instructing the Jury.** Whenever the existence of a presumed fact against the accused is submitted to the jury, the court in instructing the jury should avoid charging in terms of a presumption. The charge shall include an instruction to the effect that the jurors have a right to draw reasonable inferences from facts proved beyond a reasonable doubt and may convict the accused in reliance upon an inference of fact if they conclude that such inference is valid and if the inference convinces them of guilt beyond a reasonable doubt and not otherwise.

there was no serious issue at trial as to whether the pills obtained by the confidential informant were anything other than what the certificate of analysis, Agent Rolfe, and the confidential informant said they were: Dilaudid, which contains hydromorphone.

[¶ 19] Considered as a whole, and in the context of the evidence presented to the jury, the court's instruction was not so highly prejudicial as to constitute obvious error or produce "manifest injustice," *State v. Child,* 1999 ME 198, ¶ 7, 743 A.2d 230, 232.

B. Sufficiency of the Evidence to Prove that Barnard Trafficked Within 1000 Feet of the Real Property of a School

[¶ 20] Barnard asserts that, in denying his acquittal motions, the court erred because there was insufficient evidence to prove that his trafficking occurred "within 1,000 feet of the real property comprising a private or public elementary or secondary school." 17–A M.R.S.A. § 1105(1)(E). When the denial of a motion to acquit is challenged, we review whether the evidence was legally sufficient to support the guilty verdict. *State v. Stinson,* 2000 ME 87, ¶ 6, 751 A.2d 1011, 1013. In evaluating the sufficiency of evidence in criminal cases, "we view the evidence in the light most favorable to the State to determine whether the trier of fact rationally could have found beyond a reasonable doubt every element of the offense charged." *State v. Turner,* 2001 ME 44, ¶ 6, 766 A.2d 1025, 1027 (quoting *State v. Black,* 2000 ME 211, ¶ 14, 763 A.2d 109, 113).

[¶ 21] Although we have not previously addressed the quantum or quality of proof

needed to convict for trafficking within 1000 feet of the real property of a school, the First Circuit has recently done so. In *United States v. Soler,* 275 F.3d 146, 155 (1st Cir.2002), the court reversed a conviction under the federal "schoolyard" statute[5] because the government failed to establish that drug trafficking occurred within 1000 feet of the school. The court ruled as follows:

[T]o convict under [the federal schoolyard statute], the government must prove beyond a reasonable doubt that the distance from a school to the actual site of the transaction, not merely to the curtilage or exterior wall of the structure in which the transaction takes place, is 1,000 feet or less.... Precise measurements may be unnecessary in some cases where the spatial leeway is relatively great and the gap in the chain of proof is relatively small.... [citing cases with spatial leeway as small as 326 feet]. In such extreme instances, common sense, common knowledge, and rough indices of distance can carry the day. When the spatial leeway is modest, however, and personal liberty is at stake, courts must examine the government's proof with a more critical eye.

*Id.* at 154.

[¶ 22] Barnard's challenge to the sufficiency of the evidence regarding the distance from the school's property to his apartment presents two questions: First, whether the State established that the grassy area from which Agent Rolfe began his measurement was school property. Second, whether the State established that there was no more than 1000 feet between the school property and the location of the drug sale.

---

5. Nearly identical to 17–A M.R.S.A. § 1105(1)(E), the federal "schoolyard" statute enhances penalties for trafficking drugs within 1000 feet of any "real property comprising a public or private elementary, vocational, or secondary school." 21 U.S.C.A. § 860(a) (1999).

[¶ 23] Agent Rolfe's and the confidential informant's testimony was sufficient to establish beyond a reasonable doubt that the grassy area was school property. Specifically, the testimony established that the grassy area was just a few yards from the school building, was maintained by school personnel, and was, for many years, used by school children and adults as if it were school property. Such evidence of long history and use is sufficient to establish location and ownership of public property, particularly if it is uncontested. M.R. Evid. 803(20); *cf. Chapman v. Twitchell,* 37 Me. 59, 63 (1853). The opinions of the State's lay witnesses were properly considered because they were "rationally based on the perception of the witness[es]." M.R. Evid. 701.

[¶ 24] Turning to the sufficiency of the evidence to prove the 1000–foot distance, the evidence would permit a jury to reasonably conclude that the wall of Barnard's apartment building furthest from the school yard was parallel with, and 757 feet, 4 inches distant from, the school property. Accordingly, any location within the building was, necessarily, even closer to the school property.[6] Further, the evidence established that Barnard's apartment was in the front, third-floor section of the building. Even if the interior dis-tance to Barnard's apartment is counted from either the back door or the front door, there is no question that the jury could conclude, based on all of the evidence, that Barnard's apartment was within the 242–foot, 8–inch distance necessary to bring the transaction within 1000 feet of the school, beyond a reasonable doubt.[7] With 242 feet of leeway and a relatively small building, the First Circuit's observation that "[p]recise measurements may be unnecessary in some cases where the spatial leeway is relatively great and the gap in the chain of proof is relatively small ... common sense, common knowledge, and rough indices of distance can carry the day," *Soler,* 275 F.3d at 154, provides good guidance for this case. The evidence is sufficient to support the "within 1000 feet" finding.

## C. Sentence Review

[¶ 25] Barnard had prior convictions for Class A arson, Class B burglary, Class C theft, and two misdemeanor drug offenses. With this record, Barnard's Class A crime of aggravated trafficking in schedule W drugs could potentially have subjected him to the statutory maximum sentence of a term of forty years. The mandatory minimum sentence, which could not be suspended, was four years. 17–A M.R.S.A. § 1252(5–A)(A) (Supp.2002).[8]

---

6. On this sufficiency of the evidence challenge, there is a problem with the record which does not include a photograph, copy, or depiction of the chalkboard which was used to describe the spatial relationship of the critical properties and streets and was referenced by Agent Rolfe as he described his distance measurements. "The appellant has the burden and the responsibility to ensure that the record on appeal is sufficient to permit us to assess adequately each claim of error." *State v. Chesnel,* 1999 ME 120, ¶ 28, 734 A.2d 1131, 1140. Where the record does not include an item that is important for review on appeal, the points on appeal relating to the missing item may be viewed as not preserved. *State v. Dill,* 2001 ME 150, ¶ 10 n. 5, 783 A.2d 646, 650 n. 5.

7. For purposes of this opinion, we assume, without deciding, that interior distances from the entrance closest to the school property to the site of the transaction should be counted in calculating the 1000–foot distance. The comparable federal statute has been interpreted to apply "straight-line rather than pedestrian route measurements." *Soler,* 275 F.3d at 155 n. 6; *United States v. Johnson,* 46 F.3d 1166, 1170 (D.C.Cir.1995).

8. This subsection has been amended, effective January 31, 2003. Barnard's criminal record

The court imposed a sentence to be served that was only one year longer than the mandatory minimum, and an underlying sentence, six years, that was only two years longer than the mandatory minimum. While Barnard complains of the way the court ordered its sentencing discussion, the resulting sentence, slightly above the mandatory minimum, demonstrates no misapplication of principle.

The entry is:

Judgment affirmed. Sentence affirmed.

LEVY, J., with whom SAUFLEY, C.J., joins, concurs in part and dissents in part and files opinion.

LEVY, J., with whom SAUFLEY, C.J., joins, concurring in part and dissenting in part.

[¶ 26] I respectfully dissent from that portion of the Court's opinion regarding the sufficiency of the evidence to establish that Barnard's drug trafficking occurred within 1000 feet of the real property of a school.

[¶ 27] It is axiomatic that jurors have the "right to draw reasonable inferences from facts proved beyond a reasonable doubt." M.R. Evid. 303(c). The Court's opinion demonstrates, however, that to conclude that Barnard's trafficking took place within 1000 feet of the Calais Middle School, one must engage in several suppositions that may, in their own right, be reasonable, but which are not drawn from facts proved beyond a reasonable doubt.

[¶ 28] The sole physical evidence introduced by the State regarding the apartment building was State's Exhibit B, the photograph taken from the school some 757 feet, 4 inches away. The corner of the school property and an adjacent, broad swath of North Street compose the fore-

ground of this perspective shot, then North Street narrows, disappearing into the horizon. One cannot actually see Main Street, though one can surmise its general location from the traffic lights that, because of a downward slope in the terrain, appear to almost touch the pavement of North Street.

[¶ 29] As indicated by Agent Rolfe's answers to the following questions, it is difficult, if not impossible, to identify Barnard's apartment building in the photograph:

Q: Agent Rolfe, there's a couple of letters written on that photograph. What are those letters labeling, or what's the significance?

A: It just signifies the location of the properties. The letter C signifies the location of the middle school property, and the letter B is the location of, general location, of Mr. Barnard's apartment.

Q: And there's a letter B with an arrow pointing down?

A: Yes, that's correct.

Q: Can you actually see, in the photograph, can you see the building that Mr. Barnard was living in when you went to his residence?

A: Very little of it.

Q: What color is the building that he lives in?

A: I'm not sure of the color. There's a red brick building between them, and he lives in the one closest to North Street—excuse me—Main Street. The actual color—there are several colors, and I'm not exactly sure which one . . . .

Because the apartment building and Main Street are not discernible in this photograph, the photograph does not depict whether the Main Street wall of Barnard's

rendered him ineligible for any downward

deviation from the mandatory minimum.

apartment building is parallel to the school property.

[¶ 30] The only other visual depictions of the apartment building were two 3″ × 3″ Polaroid photographs introduced by Barnard. One shows the front of the apartment building, the building immediately adjacent to it, and a portion of a third building. It establishes that the apartment building has three floors and is located on the corner of North and Main Streets.

[¶ 31] The second photograph shows the rear of a building adjacent to or near Barnard's apartment building and a small portion of the rear of the apartment building. The foliage of a large tree blocks most of the back of the building from view, including the entire section that runs along Main Street. This hidden portion is the part of the building critical to an inference that every point within the building is closer to the school property than the far corner where North and Main intersect. The photographs do not depict or suggest the overall length of the apartment building from front to rear, the number of apartments inside the building, or the location of Barnard's apartment relative to the front and rear of the building. At the risk of belaboring the point, none of the photographs entered in evidence depict the Main Street side of Barnard's apartment building.

[¶ 32] In concluding that the State established that Barnard's trafficking of scheduled drugs occurred within 1000 feet of the Calais Middle School, the Court engages in four inferences, none of which are supported by independent facts established beyond a reasonable doubt. First, the Court characterizes the apartment building as "relatively small." *Ante* ¶ 24. There was, however, no evidence regarding the overall dimensions of the building, and none of the photographs of the build-

ing introduced by the State and Barnard provide visual information from which one can infer the overall length of the apartment building or the total number of apartments inside the building. The evidence did not establish facts beyond a reasonable doubt from which one can conclude that the apartment building is relatively small, medium, or large in dimension.

[¶ 33] Second, the Court supposes that every point within the apartment building is necessarily closer to the school property than the far corner where Agent Rolfe completed his measurement. This supposition can only be made if one knows the overall dimensions of the apartment building, the dimensions of the school property, and the spatial relationship of the two. All we know from the record is that the distance from the patch of grass at the school property to the far corner of the Main Street side of the apartment building is 757 feet, 4 inches. No other facts regarding the dimensions of the school property and the apartment building, and the spatial relationship of the two properties, were established beyond a reasonable doubt.

[¶ 34] Third, the Court assumes "the evidence would permit a jury to reasonably conclude that the wall of Barnard's apartment building furthest from the school yard was parallel with, and 757 feet, 4 inches distant from, the school property. Accordingly, any location within the building was, necessarily, even closer to the school property." *Ante* ¶ 24. No testimony or exhibits in the record, however, establish that the Main Street wall of Barnard's apartment building and the school property are or are not on parallel planes. The Court suggests in a footnote that the record is deficient in this regard because there is no reproduction of the chalkboard diagram prepared by Agent Rolfe "to de-

scribe the spatial relationship of the critical properties and streets and ... referenced by Agent Rolfe as he described his distance measurements." *Ante* ¶ 24 n. 5. In response to questions by the State, Agent Rolfe described everything depicted in the chalkboard diagram and testified that the diagram generally coincided with the photograph introduced as State's Exhibit B.[9]

[¶ 35] Fourth, the Court postulates that Barnard's apartment was in the front, three-floor section of the apartment building. Nowhere in the record is there any indication that Barnard's apartment was near or faced the North Street side of the building. The confidential informant entered the building from its rear entrance and ascended a single flight of stairs to reach Barnard's apartment in a matter of seconds, suggesting that the apartment was closer to the rear of the apartment building. Facts from which one can determine the location of Barnard's apartment within the building were not established beyond a reasonable doubt.

[¶ 36] The Court's reliance on *United States v. Soler*, 275 F.3d 146 (1st Cir.2002), is misplaced. Using a measuring wheel, the police in *Soler* measured 963 feet from the rear entrance of the apartment building in which the trafficking occurred to the corner of the school building. 275 F.3d at 154. They failed, however, to determine the distance between the base of the apart-

ment building and the third-floor landing, the precise location of the drug sale. *Id.* The government also provided a videotape of the interior of the building, which the court described as "tangential evidence of the unmeasured distance." *Id.* at 155. Noting that "[d]istances are notoriously difficult to gauge in still photographs" and in videotapes, the court attached little probative value to the videotape. *Id.* "The spatial leeway is too small and the risk of error too great," held the court, "to establish [the 1000 foot] measurement beyond a reasonable doubt." *Id.* The court, consequently, vacated the defendant's conviction. *Id.*

[¶ 37] The 242–foot, 8–inch, spatial leeway in the present case is far greater than the 37–foot undetermined distance in *Soler*. The degree of precision required for the measurement may therefore be less exacting. Nonetheless, as recognized in *Soler*, even when there is a substantial spatial leeway, the State must still offer evidence from which the jury can make a determination of distance based upon "common sense, common knowledge, and rough indices of distance." *Id.* at 154. Unlike the prosecution in *Soler*, here the State did not attempt to establish the interior distance inside the building by way of any evidence, visual or otherwise.

[¶ 38] In *Goodson v. United States*, 760 A.2d 551 (D.C.2000), the government measured 591 feet from a school to the front

---

9. Agent Rolfe's testimony reflects that the chalkboard diagram, which was not drawn to scale, and Exhibit B, which is distorted by the angle of the shot, were used to depict the 757–foot, 4–inch, measurement he made from the school to the apartment building, and not to prove the spatial relationship of the school and apartment building properties and, in particular, whether they share parallel planes. Moreover, the decisions cited by the Court in this regard are hardly comparable to the situation in this case. In *State v. Chesnel*, 1999 ME 120, ¶ 27, 734 A.2d 1131, 1140, the appel-

lant failed to agree to a hearing proposed by the State to obtain the testimony of a juror who, the appellant claimed, had engaged in misconduct. Because the forgone testimony would have been the only way to determine whether misconduct had occurred, the appellant failed to assure that the record was sufficient for appellate review. *Id.* ¶ 28, 734 A.2d at 1140. In *State v. Dill*, 2001 ME 150, ¶ 10 n. 5, 783 A.2d 646, 650 n. 5, the appellant failed to submit required materials as part of the appendix, including the written jury instructions that were the subject of the appeal.

door of a building where, in an eighth-floor apartment, drugs were seized. *Id.* at 553. Additionally, a government agent's testimony, as well as a photograph of the interior of the apartment, established that the drugs were found within fifteen feet of the apartment's front door. *Id.* There was, however, "[n]o evidence, other than that [Goodson] resided on the eighth floor, ... presented describing or depicting the size of the apartment building or where [Goodson's] apartment was within it." *Id.* With nearly 400 feet of spatial leeway with which to place the drugs within the sentence enhancement zone, the government argued plausibly "that the jury could reasonably discount the possibility that the front-door-of-building to front-door-of-apartment distance was that great." *Id.* at 554. Nevertheless, the court vacated that portion of Goodson's conviction resting upon the sentence enhancement statute on the ground of insufficient evidence. *Id.* at 556. Explained the court,

> The jury was not told the front-foot or front-to-rear dimensions of the building, or the number of units on each floor; it was given no diagrams or photographs enabling it to say whether the building was modest in size (despite its apparent height) or the kind of high-rise structure up to block-length in size not uncommon in the District of Columbia. A point-to-point distance of 400 feet within such a building is not so out of the question—at least the government does not tell us why it is—as to substitute for the absence of proof of actual distance between the entrance and [Goodson's] apartment.

*Id.* at 554.

[¶ 39] Here, as in *Goodson*, the evidence revealed nothing about where the apartment was horizontally or diagonally in relation to the far corner of the apartment building. *Id.* at 554 & n. 5. Nor does the Court conclude that a point-to-point dis-

tance of 242 feet, 8 inches, is so out of the question as to substitute for the absence of proof of actual distances within Barnard's apartment building. When viewed "in the light most favorable to the State to determine whether the trier of fact rationally could have found beyond a reasonable doubt every element of the offense charged," *State v. Turner*, 2001 ME 44, ¶ 6, 766 A.2d 1025, 1027 (quoting *State v. Black*, 2000 ME 211, ¶ 14, 763 A.2d 109, 113), the evidence failed to establish the facts necessary to conclude the actual distance of the trafficking from the Calais Middle School.

[¶ 40] The concept of "spatial leeway" does not excuse the State from having to prove an actual distance when that distance is an element of the offense charged. This would have been, by all appearances, a relatively simple task requiring no more than a few minutes effort and the use of a measuring tape or other appropriate measuring instrument. We should not permit mere supposition to substitute for reasonable inferences informed by the application of "common sense, common knowledge, and rough indices of distance" to *actual evidence*. Because a reasonable inference of the total distance from the Calais Middle School to the location at which Barnard trafficked drugs was not possible from the facts established beyond a reasonable doubt, the evidence was not legally sufficient to support the jury's determination that the criminal transaction occurred within 1000 feet of the school. Accordingly, I would vacate the conviction as it pertains to the aggravating element which increased the crime's classification from Class B trafficking in scheduled drugs, 17–A M.R.S.A. § 1103(2)(A) (Supp.2002) (current version at 17–A M.R.S.A. § 1103(1–A)(A) (Supp.2002)), to Class A aggravated trafficking in scheduled drugs, 17–A M.R.S.A. § 1105(1)(E) (Supp.2002) (current version at 17–A M.R.S.A. § 1105–

A(1)(E)(1) (Supp.2002)), and remand to the Superior Court for resentencing.