# United States Court of Appeals
## For the First Circuit

No. 01-1179

UNITED STATES OF AMERICA,

Appellee,

v.

ANIBAL SOLER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael  A. Ponsor, U.S. District Judge]

Before

Selya, Circuit Judge,

Rosenn* and Cyr, Senior Circuit Judges.

Richard Abbott, by appointment of the court, for appellant.
Todd E. Newhouse, Assistant United States Attorney, with
whom James B. Farmer, United States Attorney, was on brief, for
the United States.

January 4, 2002

_____
*Of the Third Circuit, sitting by designation.

**SELYA, Circuit Judge.** This appeal presents a series of questions, some of novel impression in this circuit, concerning various federal drug-trafficking laws. Those questions touch upon the quantum of evidence necessary to establish the existence of a drug-trafficking conspiracy; the necessity (if any) for a showing of reasonable foreseeability in a prosecution for selling heroin, death resulting; and the type and kind of proof that the government must adduce to convict a defendant of selling drugs within 1,000 feet of a school. We resolve most of these questions favorably to the government, but we resolve the last question favorably to the defendant (finding that the government did not present evidence from which a rational jury could conclude beyond a reasonable doubt that heroin sales occurred within 1,000 feet of a school). Accordingly, we affirm in part and reverse in part.

## I. BACKGROUND

We limn the facts in the light most favorable to the government, consistent with record support. United States v. Houlihan, 92 F.3d 1271, 1277 (1st Cir. 1996).

On the morning of July 21, 1999, five men — Thomas Dudek, Christopher Stevenson, Edward Thompson, Matthew Lawrence, and Granger Fulton — gathered at Stevenson's apartment in Sunderland, Massachusetts. The men drank heavily, and Lawrence

and Fulton eventually passed out. Despite having consumed between ten and twenty beers apiece, the other three drove to Holyoke in search of cocaine. Dudek, apparently the most drug-savvy of the three, directed Thompson to drive to 67 Newton St. Thompson remained in the car while his confreres climbed an exterior staircase at the back of the building.

Dudek previously had purchased cocaine on the second floor, but this time he and Stevenson ascended to the third-floor landing where a makeshift door, constructed of plywood and chicken wire, blocked further access. Defendant-appellant Anibal Soler met them at that point. When asked what they wanted, Stevenson replied, "$200 worth." The appellant retreated inside and emerged with twenty plastic bags labeled "Me Salve." He handed them to Dudek in exchange for cash.

As matters turned out, the bags contained heroin, not cocaine. Dudek apparently recognized that fact, but said nothing to the others. Stevenson began to snort some of the heroin inside the car. The men drove to Thompson's apartment in Chicopee, where all three proceeded to snort heroin until they collapsed.

Thompson's girlfriend appeared on the scene hours later and tried to revive him. Failing in this effort, she called for help. Dudek awoke before the paramedics arrived, but his two

friends remained comatose.  The paramedics rushed all three men to the hospital and, soon thereafter, Thompson was pronounced dead.

The authorities immediately undertook an investigation and enlisted Dudek's cooperation (Stevenson did not awake from his coma until seven days later).  Upon learning the source of the heroin, they decided to dispatch an undercover state trooper, Juan Colon, to 67 Newton St.  On the following day (July 22), Colon, posing as a customer, climbed the exterior stairs to the third-floor landing.  When he called into the apartment, a pregnant female emerged and asked what he wanted.  Colon responded, "two bags."  The woman left the doorway momentarily (as the appellant had done when Dudek appeared) and returned with two bags of heroin, one stamped "e Salve" (an obvious error in which the "M" in "Me Salve" presumably missed the bag's surface during the stamping process) and the other "Blunt."  Colon handed her a $20 bill and departed.

Later that day, Colon revisited the third-floor landing.  This time, the appellant responded and sold him two bags of heroin, both labeled "Blunt."  Once again, Colon paid for the drugs with a $20 bill.  The authorities then executed a search warrant for the third-floor apartment.  Both the

appellant and the pregnant woman were there when the police arrived — and both attempted to flee.

A search of the premises yielded, among other things, thirty bags of heroin (all labeled "Blunt") and over $5,000 in United States currency. Stashed with the heroin was $1,010 in cash, including the two $20 bills that Colon had used to pay for his purchases from the pregnant woman and the appellant, respectively.

In due course, a federal grand jury handed up a five-count indictment. The indictment charged the appellant with distribution of heroin, death resulting, on July 21, 1999, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) (count 1); possession of heroin with intent to distribute on July 22, 1999, in violation of 21 U.S.C. § 841(a)(1) (count 3); possession of heroin with intent to distribute within 1,000 feet of a school on each of those two dates, in violation of 21 U.S.C. § 860(a) (counts 2 and 4); and conspiracy to possess and distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) & 846 (count 5).[1] Following a ten-day trial, the jury found the appellant guilty on all five counts. On December 5, 2000, the district court imposed concurrent sentences of life imprisonment on counts 1,

_____

[1]For ease in reference, we reprint pertinent portions of these statutes in an appendix hereto.

-6-

2, and 5, thirty years on count 3, and sixty years on count 4. The court sentences were enhanced because the government, pursuant to 21 U.S.C. § 851, appropriately brought to the court's attention the appellant's previous convictions for unrelated drug-trafficking felonies. This timely appeal ensued.

## II.  THE CONSPIRACY CHARGE

We turn first to the appellant's conviction on the conspiracy count and to his contention that the evidence was insufficient to prove that charge.  The appellant raised the same point in a timely motion for judgment of acquittal.  See Fed. R. Crim. P. 29.  The district court denied the motion, finding the evidence adequate.  We review the district court's denial of a motion for judgment of acquittal de novo, applying the same standard as the lower court.  This means that we must uphold the verdict unless the evidence, viewed in the light most hospitable to the government's theory of the case, could not have persuaded a rational trier of fact, beyond any reasonable doubt, of the defendant's guilt.  United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999).  In other words, the verdict can stand if — and only if — the evidence, viewed in the requisite light, suffices to establish each element of the offense of conviction beyond a reasonable doubt.  Id.

To prove the existence of a conspiracy under 21 U.S.C. § 846, "the government must present clear evidence sufficient to show beyond a reasonable doubt that an agreement to commit the substantive offense actually existed, and that the individual defendant knew of the agreement, had intent to agree, and had intent to commit the substantive offense." United States v. Lopez-Pena, 912 F.2d 1536, 1537 (1st Cir. 1989). When direct evidence of any one or more of these elements is lacking, that element may be proven by circumstantial evidence. United States v. Barnes, 244 F.3d 172, 175 (1st Cir. 2001).

In this instance, the appellant claims that there is no significantly probative evidence to show that he and the pregnant woman (who was taken into custody, but who was neither charged in this indictment nor called as a witness at the trial) were acting in concert. Although the appellant concedes that the jury could have found that each of them was selling drugs from the identical locus, he asserts that their mere presence in the same apartment is not enough to establish the existence of a conspiracy. See United States v. Ocampo, 964 F.2d 80, 82-83 (1st Cir. 1992) (holding that mere presence of two defendants in the same apartment is insufficient to prove that both knowingly participated in drug trafficking within that apartment). Relatedly, he asserts that a conspiracy, by definition, requires

-8-

more than one member, and that the woman's participation in a single heroin sale does not establish her status as a coconspirator. See United States v. Izzi, 613 F.2d 1205, 1210 (1st Cir. 1980) (finding participation in a single drug sale, without more, to be inadequate to sustain a conspiracy conviction).

This argument is cleverly constructed, but it understates the force of the government's proof. Here, unlike in Ocampo, the evidence showed that both occupants of the apartment were actively engaged in the sale of drugs. Thus, the jury could have found that the pregnant woman was not merely present, but culpably present. Cf. United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) (distinguishing between "mere presence" and "culpable presence"). And here, unlike in Izzi, the proof did not show only a single drug sale, but, rather, three sales over a two-day period — with an inventory of heroin suggesting a readiness to engage in future transactions.

Even apart from these distinctions, the government's evidence is significantly more elaborate than the appellant suggests. The two alleged coconspirators were operating out of the same "store" and selling identically marked bags from the

same inventory.[2] Both of them were in the apartment at the time of the police raid — and both attempted to flee. Finally, and perhaps most damagingly, the $20 bills tendered to the pregnant woman and to the appellant, respectively, were found commingled in a pile of cash stored with the drugs. We think that this evidence constitutes substantial proof that the two were engaged in a common enterprise, the proceeds of which were pooled. See generally United States v. LiCausi, 167 F.3d 36, 45 (1st Cir. 1999) ("In reviewing a jury's finding that a single conspiracy existed, we consider specifically such factors as the commonality vel non of the nature, motive, design, implementation, and logistics of the illegal activities as well as the scope of coconspirator involvement.").

The appellant interposes a final objection, noting that there was no evidence of the pregnant woman's participation in the venture on the first day of the alleged two-day conspiracy. This objection is wide of the mark. There is no requirement that each coconspirator participate in every act of the conspiracy. Cf. United States v. David, 940 F.2d 722, 735 (1st

---

[2]The appellant confessed at one point that he had been selling Me Salve heroin but that his supply of Me Salve had been exhausted on July 22, at which point he switched to Blunt. The serial sales, including the pregnant woman's sale to Colon, fit into this pattern and strongly suggest that both vendors were selling from the same inventory.

-10-

Cir. 1991) (explaining that one who joins a conspiracy may be held "accountable for the earlier acts of his coconspirators in furtherance of the conspiracy"). Here, the government adduced competent proof that the object of the conspiracy — heroin distribution — took place over a two-day period. We think that a rational jury easily could conclude — as this jury did — that these activities came within the scope of a tacit agreement between the two coconspirators. Consequently, we affirm the appellant's conviction on count 5.

## III.  THE "DEATH RESULTING" CHARGE

In count 1 of the indictment, the grand jury charged a violation of 21 U.S.C. § 841(b)(1)(C). Under that statute, a drug trafficker faces an enhanced sentence "if death or serious bodily injury results from the use [of the drugs purveyed]." The appellant argues that the statute is inapposite because the key event leading to the death — Thompson's snorting of heroin under the misimpression that it was cocaine — was not reasonably foreseeable (and, thus, the death itself was not reasonably foreseeable). This brings us to the preliminary question of whether the operation of section 841(b)(1)(C) depends to any extent upon proof that death was reasonably foreseeable.

This is a question of first impression in this circuit. The district court answered it in the negative.[3] Because this is a purely legal issue, we review the correctness of the district court's disposition de novo. United States v. Pitrone, 115 F.3d 1, 4 (1st Cir. 1997).

By its terms, the statute of conviction applies whenever "death . . . results" from the use of drugs supplied by the defendant. 21 U.S.C. § 841(b)(1)(C). The fact that the statute does not speak to the defendant's state of mind undercuts the appellant's argument that we should impose some kind of foreseeability test. After all, Congress knows how to write statutes containing state-of-mind requirements — and Congress demonstrated that facility in crafting this very statute. E.g., id. § 841(a) (prohibiting knowing and intentional drug trafficking). This makes the omission of an explicit intent requirement in section 841(b)(1)(C) telling. See Duncan v. Walker, 121 S. Ct. 2120, 2125 (2001) ("'[W]here Congress includes particular language in one section of a

---

[3]The court charged the jury in pertinent part:

The government need not prove that the defendant knew his distribution of heroin could result in the death of another . . . . All that the government must prove beyond a reasonable doubt is that Mr. Thompson used the heroin the defendant distributed, and that but for Mr. Thompson's use of the defendant's heroin, Mr. Thompson would not have died.

statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting Russello v. United States, 464 U.S. 16, 23 (1983)); In re 229 Main St. Ltd. P'ship, 262 F.3d 1, 5-6 (1st Cir. 2001) (same).

The case law tracks in the same direction. Although the appellant cites several cases that he claims impose a reasonable foreseeability requirement, those cases all involve liability of one coconspirator for the acts of others. E.g., United States v. Swiney, 203 F.3d 397, 339 (6th Cir. 2000); United States v. Chisholm, 73 F.3d 304, 208 (11th Cir. 1996); United States v. DePriest, 6 F.3d 1201, 1212-13 (7th Cir. 1993). When the defendant's own conduct has caused the harm, those cases are inapposite. Rather, a rule of strict liability applies. See United States v. McIntosh, 236 F.3d 968, 972 (8th Cir. 2001) (holding, in the context of subsection 841(b)(1)(A), that "giving effect to [the statute's] plain meaning prohibits us from superimposing upon the statute a foreseeability or proximate cause requirement"); United States v. Patterson, 38 F.3d 139, 145 (4th Cir. 1994) (holding that section 841(b)(1)(C) does not require a finding that death resulting from the use of a distributed drug was reasonably foreseeable). Thus, when a defendant deals drugs and a user of those drugs dies as a

-13-

result, section 841(b)(1)(C) applies without any independent proof that the death was a reasonably foreseeable event. Because the lower court correctly apprehended this point, we affirm the appellant's conviction on count 1.

## IV. THE "SCHOOLYARD" COUNTS

21 U.S.C. § 860(a), colloquially called "the schoolyard statute," provides enhanced penalties, inter alia, for the sale of drugs within 1,000 feet of a school. The jury convicted the appellant of violating this statute on both July 21 (count 2) and July 22 (count 4). The appellant mounts a two-pronged challenge to these convictions. We consider each prong separately.

### A. <u>The School</u>.

The schoolyard statute focuses on the sale of drugs within 1,000 feet of any "real property comprising a public or private elementary, vocational, or secondary school . . . ." 21 U.S.C. § 860(a). The appellant questions whether the government presented sufficient evidence that such a facility existed in the vicinity of 67 Newton St. We think that it did.

To be sure, the government's proof is grudgingly bare. The only testimony on the point came from a Holyoke police officer, William Lempke, who identified a nearby structure as "Lawrence Elementary School" and stated that it was "a public

-14-

school in Holyoke." The appellant insists that Lempke was not a competent witness on the point — but he did not object to the testimony when it was adduced and has waived any right to challenge the witness's competence on appeal. United States v. Taylor, 54 F.3d 967,972 (1st Cir. 1995) (discussing operation of the raise-or-waive rule).

Of course, even if Lempke was a competent witness, it is arguable that his testimony, standing alone, was insufficient to prove the existence of a school beyond a reasonable doubt. On this point, the appellant strikes a responsive chord when he posits that the introduction of a map, the testimony of a city planner, or evidence from a school official would have been a vastly preferable means of establishing that fact. The issue, however, is not whether the government proved this element of the offense in the best or most effective way, but, rather, whether the proof adduced was legally adequate. After all, sufficiency of evidence is a context-specific concern, and it must be determined by whether a rational juror could have found the essential fact beyond a reasonable doubt. See Lara, 181 F.3d at 200.

In the case at hand, the witness had been a member of the local police force for fifteen years. He testified that he was intimately familiar with the neighborhood and that he worked

out of a police station located within a block of 67 Newton St. (and, thus, quite close to the structure that he identified as a school). Taking these facts into account and giving the government the benefit of the inferences therefrom, see Houlihan, 92 F.3d at 1277, we conclude that the officer's testimony was enough — if barely — to prove the existence of a school.[4]

## B. **The Measurement**.

The second prong of the appellant's argument is more finely honed. He faults the government for not presenting adequate evidence that a drug transaction took place within the proscribed area — the 1,000-foot distance specified in section 860(a).

This court has not spoken to how distance ought to be measured in cases brought under the schoolyard statute. We do so today. In order to convict under section 860(a), the government must prove beyond a reasonable doubt that the

---

[4]This case is distinguishable from United States v. Smith, 13 F.3d 380 (10th Cir. 1993), much bruited by the appellant. There, the court found testimony that a park contained a playground insufficient for purposes of section 860. The statute, however, contains a specific definition of what constitutes a playground, see 21 U.S.C. § 860(e) (stating that a playground must have "three or more separate [recreational] apparatus"), and the police officer who testified in Smith did not speak to this aspect of the definition, see 13 F.3d at 382. Section 860 contains no such qualifying language for what constitutes a school.

-16-

distance from a school to the actual site of the transaction, not merely to the curtilage or exterior wall of the structure in which the transaction takes place, is 1,000 feet or less. See United States v. Harrison, 103 F.3d 986, 990 (D.C. Cir. 1997); United States v. Johnson, 46 F.3d 1166, 1169-70 (D.C. Cir. 1995). To achieve this benchmark here, the government again relies upon officer Lempke's testimony. Lempke stated that he used a measuring wheel as he walked from the rear entrance of 67 Newton St. to the corner of the school building. He calculated that distance to be 963 feet. But this left an obvious gap — the distance between the base of the Newton St. building and the third-floor landing on which the heroin was sold — and the government offered no direct evidence as to that distance.

In an effort to fill this void, the government asseverates that a reasonable jury could have determined the unmeasured distance based on a videotape made during an unrelated drug raid earlier that month. This asseveration rings hollow. Precise measurements may be unnecessary in some cases where the spatial leeway is relatively great and the gap in the chain of proof is relatively small. E.g., United States v. Glover, 153 F.3d 749, 756 (D.C. Cir. 1998) (holding 326-foot leeway sufficient to cover measurement gap from front door of convenience store to the store's basement); Harrison, 103 F.3d

at 990 (holding 528-foot leeway sufficient to cover measurement gap from the exterior of an apartment building to defendant's unit); United States v. Baylor, 97 F.3d 542, 546 (D.C. Cir. 1996) (holding 466-foot leeway sufficient to cover measurement gap from the exterior of an apartment building to defendant's basement apartment). In such extreme instances, common sense, common knowledge, and rough indices of distance can carry the day. When the spatial leeway is modest, however, and personal liberty is at stake, courts must examine the government's proof with a more critical eye.

United States v. Applewhite, 72 F.3d 140 (D.C. Cir. 1995), illustrates the point. There, the court of appeals reversed a conviction on the ground that there was no evidence from which a jury could conclude that the defendant's kitchen, where drugs were found, was within the relatively small leeway (under eighty feet) left open by a measurement of the distance between the school and the entrance to the apartment building in which the defendant resided. Id. at 143-44. So too Johnson, in which the court reversed a conviction where the only evidence of distance was a measurement of 994 feet up to the walkway of the defendant's house. 46 F.3d at 1169-70.

The case at hand is one in which the spatial leeway is exceedingly modest: the gap here is thirty-seven feet. We have

-18-

viewed the videotape mentioned by the government and find unconvincing the assertion that the jury could have determined from it beyond a reasonable doubt that the vertical distance was less than thirty-seven feet. Although the videotape was played several times for the jury, it was neither filmed with an eye toward elucidating relative distances nor introduced into evidence for that purpose. Moreover, it showed the relevant portion of the building fleetingly and as an incidental matter; the camera angles were distorted by the repeated use of a zoom lens; and the prosecutor did not even attempt to draw the jury's attention to the scale involved.

To say more on this point would be supererogatory. Distances are notoriously difficult to gauge in still photographs, see Baylor, 97 F.3d at 546 ("Spatial relationships are hardly intuitive, and photographs can distort distances."), and more so in motion pictures (such as videotapes). This case is no exception. We conclude that the videotape is some tangential evidence of the unmeasured distance, but it is not sufficient evidence to establish that measurement beyond a reasonable doubt. The spatial leeway is too small and the risk of error too great. Although it is possible (indeed, probable) that the distance from the school to the site of the heroin

sales was less than 1,000 feet,[5] that is not good enough. The government must prove the elements of an offense beyond a reasonable doubt — and its proof here simply does not conform to that high standard.

We are constrained to add that, in this instance, the government plainly has been the author of its own misfortune. A simple measuring tape dropped from the third-floor landing would have closed the gap and resolved all doubt.[6] If that measurement would have favored the government, it is hard to imagine why the government did not undertake it. In all events, the insufficiency of the evidence on this point undermines the appellant's convictions on counts 2 and 4.

## V. CONCLUSION

---

[5]One reason for this intuition is that the government's 963-foot measurement likely overstates the distance from the school to the corner of the apartment building. That measurement started at the school building itself, rather than at the "real property comprising [the] school." 21 U.S.C. § 860(a). The government has made no such argument, however, and it has provided no basis for calculating the distance from the school building to the lot line. We therefore do not probe the point. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that arguments not properly developed on appeal are deemed waived).

[6]A direct vertical measurement, rather than one following the winding staircase, would have been appropriate, as the schoolyard statute envisions straight-line rather than pedestrian-route measurements. Johnson, 46 F.3d at 1170; United States v. Watson, 887 F.2d 980, 981 (9th Cir. 1989).

-20-

We need go no further. The government introduced sufficient evidence on the conspiracy charge, and the district court correctly refused to instruct the jury that section 841(b)(1)(C) contains a requirement of reasonable foreseeability. Thus, we affirm the appellant's convictions on counts 1, 3, and 5, and leave intact the sentences on those counts. The government, however, failed to prove beyond a reasonable doubt that any drug transaction occurred within 1,000 feet of a school. Hence, we reverse the appellant's convictions on counts 2 and 4, and vacate the sentences imposed on those counts.

**Affirmed in part and reversed in part.**

**Relevant excerpts from the United States Code  21 U.S.C. §§ 841, 846, 860 (1994 & Supp. V 1999).**

**§ 841. Prohibited acts A**

(a) Unlawful acts.  . . . [I]t shall be unlawful for any person knowingly or intentionally--

> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . .

(b) Penalties.  . . . [A]ny person who violates subsection (a) of this section shall be sentenced as follows:

> (1)
>
> . . . .
>
> (C) In the case of [heroin and certain other controlled substances, and] except as provided in subparagraphs (A), (B), and (D), such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life . . . .  If any person commits such a

violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment. . . .

## § 846. Attempt and conspiracy

Any person who attempts or conspires to commit any offense defined in this title shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## § 860.   Distribution in or near schools

(a) Penalty. Any person who violates section 401(a)(1) [21 USCS § 841(a)(1)] . . . by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university, or a playground, or housing facility owned by a public housing authority, or within 100 feet of a public or private youth center, public swimming pool, or video arcade facility, is

(except as provided in subsection (b)) subject to (1) twice the maximum punishment authorized by section 401(b) [21 USCS § 841(b)]. . . .