MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2019 ME 41
Docket:         And-17-553
Argued:         October 25, 2018
Decided:        March 14, 2019
Revised:        July 16, 2019

Panel:          SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Concurrence:    SAUFLEY, C.J., and MEAD, J.

STATE OF MAINE

v.

DAVID T. BROWN

JABAR, J.

[¶1]   David T. Brown appeals from a judgment of conviction of four counts of aggravated trafficking in schedule W drugs (Class A), 17-A M.R.S. § 1105-A(1)(E)(1) (2018) (Counts 1-4), and one count of unlawful possession of schedule W drugs (Class C), 17-A M.R.S. § 1107-A(1)(B)(3) (2018) (Count 5), entered by the court (Androscoggin County, *Delahanty, J.*) following a jury trial.[1] Brown's primary contention on appeal is that there was insufficient evidence

---

[1]  Brown was also convicted of four counts of violating a condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2018) (Counts 6-9), after he waived his right to a jury trial on those charges pursuant to M.R.U. Crim. P. 23(a). Because Brown does not assign error to these convictions, we do not address them further.

2

that he trafficked within 1,000 feet of a school.[2]  Because the State did not

present evidence from which a jury could rationally conclude beyond a

reasonable doubt that Brown trafficked within 1,000 feet of a school, we vacate

the aggravating factor that elevated the crime from Class B trafficking in

schedule drugs, 17-A M.R.S. § 1103(1-A)(A) (2018), to Class A aggravated

trafficking in schedule W drugs, 17-A M.R.S. § 1105-A(1)(E)(1),[3] and we

remand to the Unified Criminal Docket for resentencing.

## I.  BACKGROUND

[¶2]  By criminal complaint filed on February 21, 2017, and then by

indictment filed on May 5, 2017, Brown was charged with four counts of

aggravated trafficking in schedule W drugs (Class A).  *See* 17-A M.R.S.

§ 1105-A(1)(E)(1).  Viewed in the light most favorable to the jury's verdict, the

record supports the following facts.  *See State v. Adams*, 2015 ME 30, ¶ 2,

113 A.3d 583.

---

[2] Brown also contends that there was insufficient evidence that he possessed the requisite amount of cocaine base in order to invoke the permissible inference for trafficking under 17-A M.R.S. § 1103(3)(B) (2018) and to sustain a conviction under 17-A M.R.S. § 1107-A(1)(B)(3) (2018). In light of our recent and controlling holding in *State v. McLaughlin*, 2018 ME 97, 189 A.3d 262, we affirm the convictions on Count 4 and Count 5 and do not discuss Count 5 further.  We discuss Count 4 only with regard to the aggravating factor of trafficking within 1,000 feet of a school.

[3] As relevant to this case, 17-A M.R.S. § 1105-A(1)(E) (2018) provides that a person commits the enhanced trafficking offense if that person "violates [17-A M.R.S. § 1103]" and "[a]t the time of the offense, the person is on a school bus or within 1,000 feet of the real property comprising a private or public elementary or secondary school or a safe zone."

A.    Four Counts of Aggravated Trafficking

[¶3]  In December 2016, an agent with the federal Drug Enforcement Agency (DEA) began conducting a series of controlled purchases of crack cocaine from Brown using a confidential informant.  Brown resided on the second floor of an apartment building located at 72 Walnut Street in Lewiston, in the vicinity of the Governor James B. Longley Elementary School, which is located on Birch Street.  The apartment building has two entrances: one at the front of the building on Walnut Street and another on the right side of the building on Prince Street.  The entrance on the Prince Street side proceeds up a flight of stairs to the second floor.  On the second floor, a door off the stairs leads into the kitchen area of the apartment.  There is a living room to the left of the kitchen and off of the living room are two bedrooms.  The bedroom closest to Walnut Street belonged to the owner of the apartment building, and the other bedroom was Brown's.[4]

[¶4]  During the first day of trial, the confidential informant testified about the three controlled buys from Brown, each of which took place

---

[4]  The evidence concerning the general layout of the interior of the 72 Walnut Street apartment was provided through the testimony of various witnesses.  Additionally, there was one photograph taken from the street that depicted the front of the apartment building and a tax map showing the location of Longley Elementary School and a portion of Walnut Street, but not the location of 72 Walnut Street specifically.  There was no evidence that showed or described the entire layout of the apartment, such as a schematic diagram.

4

somewhere in Brown's apartment. The confidential informant testified that she entered the apartment from the Prince Street side door and would meet Brown in either his bedroom or the living room. With regard to the actual location of the controlled buys, she testified:

> Q    And where would you meet when you go inside of 72 Walnut?
>
> A    Usually, if it wasn't the living room, it was his bedroom.
>
> . . . .
>
> Q    Okay. Okay. So you would go into that [bedroom] and you . . .
>
> A    I usually wouldn't go into the room. I wouldn't go [nowhere] past the door. I would stand at the door like . . . out the door. And he had a dresser, do his thing, give me -- if it wasn't there, it was on that end table in the living room.

[¶5] The first count of aggravated trafficking in schedule W drugs stems from the first controlled purchase, which occurred on December 23, 2016. During this controlled buy, Brown sold the confidential informant 2.8 grams of crack cocaine in exchange for $400. Describing this buy, the confidential informant testified that Brown was "in the bedroom" and that she gave the money to him in return for crack cocaine.

[¶6]  The second controlled purchase, which was the basis of the second count of aggravated trafficking in schedule W drugs, took place on December 29, 2016.  During this controlled buy, Brown sold the confidential informant 1.737 grams of crack cocaine in exchange for $400.  The confidential informant did not testify about precisely where she was inside the apartment during this buy.

[¶7]  The third and final controlled purchase was conducted on February 10, 2017, when Brown sold the confidential informant 1.69 grams of crack cocaine for $300.  This controlled buy led to the third count of aggravated trafficking in schedule W drugs.  Again, the confidential informant did not testify about the precise location of this buy.

[¶8]  Following the three controlled buys, law enforcement officers obtained and executed a search warrant for the apartment at 72 Walnut Street.  While searching Brown's bedroom, a DEA agent discovered a bag of crack cocaine weighing approximately 27 grams.  This formed the basis for a fourth count of unlawful trafficking in schedule W drugs based on the permissible inference provided in 17-A M.R.S. § 1103(3)(B) (2018) that Brown's possession of fourteen grams or more of cocaine constituted unlawful trafficking in scheduled drugs.

6

[¶9]  The State charged all four counts as aggravated trafficking, alleging that the drugs were discovered, and the controlled buys occurred, within 1,000 feet of the real property of Longley Elementary School.  *See* 17-A M.R.S. § 1105-A(1)(E)(1).

B.     Evidence Concerning the Distance Between 72 Walnut Street and Longley Elementary School

[¶10]   The court held a three-day jury trial from September 25 to September 27, 2017.  On the first day of trial, a DEA agent testified that he used a measuring wheel to measure the distance between the front entrance of 72 Walnut Street and the property line of Longley Elementary School.  Specifically, the DEA agent started his measurement at the "front step" of 72 Walnut Street, took a diagonal route across Walnut Street, and proceeded down Howe Street in a straight line to Longley Elementary School, where he ended the measurement "four or five feet" onto school property.  This measurement totaled 958.9 feet.

[¶11]   The following morning, after being informed that the "vertical distance" to the location where the drug transaction occurred should be accounted for in the measurement, the DEA agent returned to the apartment and conducted additional measurements.  When he testified about his second set of measurements, the DEA agent explained that he entered the building

using the Walnut Street entrance and then "measured from the living room to the exterior of the building, which was 16.9 feet. And from that second-floor exterior of the building to the ground, which was, I believe 12.4 feet." He then added in the distance from the spot on the ground out to the location on the platform where he had begun his initial measurements. All four measurements, added together, totaled 996.2 feet. On cross-examination, the agent acknowledged that, in taking his interior measurements, he had begun at the doorway to Brown's living room, and that it was "unlikely" that the buys had occurred in that doorway.[5]

C.      Jury Instructions and Verdict

[¶12] During jury deliberations, the jury sent a note to the court asking whether vertical distance must be included in measuring the distance from the trafficking to the school and requesting "[c]larification on the law on what is 1,000 feet: a straight-line distance, a walking path, a radius?" Despite defense counsel's objection—that there was no evidence presented about what a straight-line measurement would be—the court gave the jury a new written

---

[5] After the State presented its case-in-chief, defense counsel moved for a judgment of acquittal on the aggravating trafficking charge, which the court denied, stating, "I do acknowledge that the evidence with respect to the distance from the school, there is conflicting evidence, but that is a matter for the jury to sort out."

8

instruction, stating, "The 1,000 feet is a straight-line measurement from the location where the offense occurred to the property line of the school. Maine law is silent as to vertical feet. If there is a reasonable doubt or ambiguity because of a vertical measurement, it must be resolved in favor of the defendant."

[¶13] The jury returned a guilty verdict on all four counts of aggravated trafficking in schedule W drugs. On December 4, 2017, Brown was sentenced to ten years in prison on the four convictions of aggravated trafficking in schedule W drugs. Brown timely appealed the judgment of conviction. *See* 15 M.R.S. § 2115 (2018); M.R. App P. 2B(b)(1).

## II. DISCUSSION

[¶14] Brown argues that there was insufficient evidence for the jury to find that his drug trafficking occurred within 1,000 feet of the real property of Longley Elementary School. "When a defendant challenges the sufficiency of the evidence supporting a conviction, we determine, viewing the evidence in the light most favorable to the State, whether a trier of fact rationally could find beyond a reasonable doubt every element of the offense charged." *State v. Anderson*, 2016 ME 183, ¶ 30, 152 A.3d 623 (quotation marks omitted). The jury is permitted to draw all reasonable inferences from the evidence presented

at trial. *State v. Hopkins*, 2018 ME 100, ¶ 51, 189 A.3d 741. "The interpretation of a statute is a legal issue we review de novo." *State v. Cannady*, 2018 ME 106, ¶ 7, 190 A.3d 1019 (quotation marks omitted).

[¶15] The narrow question presented is whether, based on the evidence presented, a jury rationally could have found, beyond a reasonable doubt, that Brown trafficked within 1,000 feet of school property. Although we considered a similar issue in *State v. Barnard*, 2003 ME 79, 828 A.2d 216, we have yet to explicitly determine how the distance ought to be measured in order to sustain a conviction under 17-A M.R.S. § 1105-A(1)(E)(1)-(6) (2018). We do so today by determining (1) what two points must be measured, (2) whether the straight-line or the pedestrian-route approach applies, and (3) whether the 1,000-foot distance includes any difference in elevation between the two points to be measured.

A.    Measuring the Distance Between the Real Property of the School and the Location of the Offense

[¶16] In order to conduct a measurement, one must know the two points that mark the distance to be measured. In *Barnard,* "we assume[d], without deciding, that interior distances from the entrance closest to the school property to the site of the transaction should be counted in calculating the 1,000-foot distance." 2003 ME 79, ¶ 24 n.7, 828 A.2d 216. Today, we explicitly

hold that, in order to sustain a conviction under 17-A M.R.S. § 1105-A(1)(E)(1)-(6), the distance to be measured is the distance between the real property of the school and the location of the drug trafficker at the time of the offense.

[¶17]  Pursuant to 17-A M.R.S. § 1105-A(1)(E):

> **1.**  A person is guilty of aggravated trafficking in a scheduled drug if the person violates section 1103 and:
>
> . . . .
>
> **E.**  At the time of the offense, the person is on a school bus or within 1,000 feet of the real property comprising a private or public elementary or secondary school or a safe zone . . . .
>
> . . . .

Read carefully, the language of the statute provides a key distinction between the two points between which the distance is to be measured.  The statute requires that a measurement be made between a point on "the real *property*" of the school or safe zone and the point at which "the *person*" is trafficking. 17-A M.R.S. § 1105-A(1)(E) (emphasis added).

[¶18]  The Legislature's use of the terms "real property" and "person" in section 1105-A(1)(E) is critical because, had the Legislature intended to have jurors and courts determine the distance between the school property and the property where the trafficking occurred, it would have used different language.

Instead, the Legislature chose to focus on the location of the trafficker at the time of the drug transaction. For us to disregard this distinction would be to render the term "the person" mere surplusage, and "because no language is to be treated as surplusage if it can be reasonably construed, we must give meaning to this language." *McLaughlin*, 2018 ME 97, ¶ 16, 189 A.3d 262 (alteration omitted) (quotation marks omitted).

[¶19] Although the plain language of section 1105-A(1)(E) is dispositive in our analysis, we note that federal courts have interpreted comparable federal statutes the same way. *See United States v. Applewhite*, 72 F.3d 140, 144 (D.C. Cir. 1995) (holding that the government must prove that the distance between the school and the "locus of the drug offense" is less than 1,000 feet); *United States v. Johnson*, 46 F.3d 1166, 1169 (D.C. Cir. 1995) ("[T]he government inexplicably offered evidence not of the distance from a school to the point in the house where [the defendant] possessed the drugs, but only . . . to a point five feet up the walkway to [the defendant's] house."). Thus, for purposes of measuring the 1,000-foot distance under 17-A M.R.S. § 1105-A(1)(E), the State must prove beyond a reasonable doubt that the distance between the real property of the school and the location of the alleged drug trafficker at the time of the offense is within 1,000 feet.

12

B.      Straight-Line Measurement versus Pedestrian-Route Measurement

[¶20]  In *Barnard*, 2003 ME 79, ¶¶ 5, 24, 828 A.2d 216, we affirmed a defendant's conviction of aggravated trafficking after the State established that the trafficking occurred within 757 feet, 4 inches of a school.  In doing so, we relied on precedent from the United States Court of Appeals for the First Circuit and determined that a straight-line measurement rather than a pedestrian-route measurement should be applied.  *Id*. ¶¶ 21, 24 n.7 (citing *United States v. Soler*, 275 F.3d 146, 154-55 & n.6 (1st Cir. 2002)).

[¶21]   Because the reasoning behind employing a straight-line measurement is most persuasive, we reaffirm our holding in *Barnard* that the 1,000-foot measurement must be calculated using a straight-line measurement. *See United States v. Clavis*, 956 F.2d 1079, 1088 (11th Cir. 1992) (stating that if a pedestrian-route measurement were required, "[a] trafficker could operate free of the statute by placing his operation within tossing distance of the schoolyard fence if he could find—or create—a long enough footpath leading to it"); *United States v. Watson*, 887 F.2d 980, 981 (9th Cir. 1989) ("Only a straight line measurement creates a readily ascertainable zone of protection."); *United States v. Ofarril*, 779 F.2d 791, 792 (2d Cir. 1985) (reasoning that a pedestrian-route measurement "would violate the plain meaning of the statute"

and "generate needless and time-consuming debate, and ultimately hamper the statute's enforcement.").

C.    Difference in Elevation Between the Two Points to be Measured

[¶22]   Next, we address whether, for purposes of measuring the 1,000-foot distance under 17-A M.R.S. § 1105-A(1)(E), the difference in elevation between the two points—the boundary of the school property and the location of the trafficker at the time of the offense—should be accounted for in the calculation.  We conclude that it should.

[¶23]  Although section 1105-A(1)(E) does not expressly state that any difference in elevation must be considered, we find critical guidance in what it does and does not provide: the statute (a) identifies the beginning and ending points of the measurement; (b) states that the distance between those two points necessary to enhance a sentence under this section is less than 1,000 feet; and (c) does not require that the distance be measured only along a horizontal plane.  17-A M.R.S. § 1105-A(1)(E).  Moreover, because the plain language of the statute is "reasonably susceptible to different interpretations" with regard to whether any difference in elevation must be considered, *Cannady,* 2018 ME 106, ¶ 7, 190 A.3d 1019 (quotation marks omitted), and the record of the Legislature's deliberative process does not shed any light on the

14

Legislature's intent with regard to elevation, L.D. 1740, § 119 (120th Legis. 2001), we consider other relevant indicia of legislative intent. *Dyer v. Dyer*, 2010 ME 105, ¶ 7, 5 A.3d 1049. Among those indicia are two interrelated canons of statutory construction: the rule of lenity and the rule of strict construction. *State v. Blum*, 2018 ME 78, ¶ 10 n.5, 187 A.3d 566. "Pursuant to each of these rules, any ambiguity left unresolved by a strict construction of the statute must be resolved in the defendant's favor." *State v. Pinkham*, 2016 ME 59, ¶ 14, 137 A.3d 203 (quotation marks omitted).

[¶24] Consistent with *Barnard*, the distance between the two points must be measured along a straight line from one point to the other, and the course of the line must not deviate on account of any obstacles in its path. Our discussion in *Barnard*, together with the aforementioned legislative considerations and simple logic, allows us to conclude that the straight-line measurement between the school boundary line and the location of the trafficker in this case must account for any difference in elevation because that difference could place the transaction site outside of the aggravating zone, whereas a linear horizontal measurement might not.

[¶25] This leads to a related inquiry regarding the proper method for measuring the distance between these points at different elevations. Other

courts have approached this issue differently. In *Soler*, the First Circuit suggested that the distance between the school boundary and a drug transaction site located in an upper floor of a building could be measured horizontally along the ground, then vertically up the side of the building, and then horizontally again to the precise site of the transaction, moving along the various external and internal surfaces of the building. 275 F.3d at 154-55. Although there is no question that measuring in this way creates a line between the two points that runs in a *straight direction* when seen from a bird's-eye view, it does not create a *straight line* consistent with *Barnard*. 2003 ME 79, ¶¶ 21, 24 n.7, 828 A.2d 216.[6]

[¶26] In contrast, the United States Court of Appeals for the Eleventh Circuit employed a simpler methodology by extending 1,000-foot radii *from and around* each point on the boundaries of the school property to capture any drug transaction site within that area.[7] *Clavis*, 956 F.2d at 1088 ("The way to

---

[6] A straight line is one that extends in "the same direction throughout its length; having no curvature or angularity." *Straight*, Webster's New World College Dictionary (5th ed. 2016). The series of straight lines and right angles resulting from the *United States v. Soler*, 275 F.3d 146, 153-55 (1st Cir. 2002) measurement are more akin to the pedestrian route we have already dismissed in *State v. Barnard*, 2003 ME 79, ¶¶ 21, 24 n.7, 828 A.2d 216.

[7] A radius is "any straight line extending from the center to the periphery of a circle or sphere [or] the circular area or distance limited by the sweep of such a line." *Radius*, Webster's New World College Dictionary (5th ed. 2016).

16

create a definite and identifiable zone is by extending radii outward around the property on which the school is located."). Although *Clavis* involved measuring the distance only on a horizontal plane, *id*., a variation on that approach may be appropriate for measuring whether two points at different elevations are within 1,000 feet of each other.[8] For example, extending a straight line *from* the trafficker's location and adjusting the direction of that line at an angle up or down directly to its intersection, if any, with the boundary line of the school property creates a single, unbroken straight line rather than a series of connected straight lines—heading in the same direction but extending at different angles—as suggested in *Soler*.[9]

[¶27]  However, because the State did not present evidence from which a jury rationally could determine with any certainty the exact location of any of the transactions at issue, as is necessary to be able to find beyond a reasonable

---

[8]  Unlike the creation of an area on a horizontal plane around the real property as in *United States v. Clavis*, 956 F.2d 1079, 1088 (11th Cir. 1992), the radius methodology could be applied differently to determine whether the trafficking occurred in a protected area where the trafficking and the school are at different elevations.  Relevant to the facts in this case, those points could be measured along a straight line that is the shortest distance between a single identified point—the transaction site on the second floor of a building—and the ground-level boundary of the school property, which has an untold number of points around its perimeter.  For that reason, the straight-line radius should extend *from* the transaction site to its closest point of intersection, if any, with the school's boundary.

[9]  The resources or formulae used to calculate or measure the actual distance between two points at different elevations may vary depending on the circumstances of each case and, without limitation, could include available technology, maps, line-of-sight measurement, or a relevant mathematical formulation (for example, the distance between two points at different elevations may be ascertained using the Pythagorean Theorem).

doubt that Brown trafficked within 1,000 feet of school property, this case does not require us to decide the proper method for measuring the distance between these points. *See infra* ¶¶ 32-41. We hold only that the measurement of 1,000 feet, which acts as an aggravating element pursuant to 17-A M.R.S. § 1105-A(1)(E), must—in some way—include any difference in elevation between the location of the trafficker at the time of the offense and the boundary of the real property of the school.

D.      Spatial Leeway

[¶28]   In some cases involving the 1,000-foot distance for purposes of enhancing a sentence for trafficking in scheduled drugs, federal courts have determined that "[p]recise measurements may be unnecessary . . . where the spatial leeway is relatively great and the gap in the chain of proof is relatively small." *Soler*, 275 F.3d at 154; *see United States v. Baylor*, 97 F.3d 542, 546-47 (D.C. Cir. 1996). The First Circuit has described spatial leeway as an exception to its general insistence that the government prove the 1,000-foot distance with precise measurements, and it has explained that it may be applied in such cases where "common sense, common knowledge, and rough indices of distance can carry the day." *United States v. Diaz*, 670 F.3d 332, 338 (1st Cir. 2012) (quotation marks omitted). Thus, spatial leeway may be applied in cases where

evidence of precise measurements is lacking but the amount of spatial leeway allows a fact-finder to reasonably infer from other evidence that the distance is still within 1,000 feet.

[¶29]  In *Applewhite*, the government presented evidence that the distance from a school to "the address" of the defendant's apartment building where the drug offense occurred was 920.2 feet, a distance that "clearly [did] not include the distance between the entrance to the building and the place in [the defendant's] apartment where the drugs were discovered." 72 F.3d at 142. Rejecting the government's argument that the jury reasonably could have determined that the distance from the building entrance to the precise location of the drugs was not more than 79.8 feet, the United States Court of Appeals for the District of Columbia Circuit reasoned,

> [T]he jury could not know how many other apartment units in the same building also fronted upon [the same street], nor their location relative to [the defendant's apartment where the drug offense occurred], nor their dimensions nor, therefore, the distance between the building entrance and [the apartment's] living room wall, nor even whether [the] apartment was on the first floor.

*Id.* at 144.

[¶30]  In *Barnard*, we applied the spatial leeway principle when we held that the jury reasonably could infer that the distance was within 1,000 feet. 2003 ME 79, ¶¶ 2, 24, 828 A.2d 216.  Because the facts in *Barnard* established

that "any location within the building was, necessarily, even closer to the school property" and the State's measurement left 242 feet, 8 inches of spatial leeway, we stated,

> Even if the interior distance to [the defendant's] apartment is counted from either the back door or the front door, there is no question that the jury could conclude, based on all of the evidence, that [the defendant's] apartment was within the 242-foot, 8-inch distance necessary to bring the transaction within 1000 feet of the school, beyond a reasonable doubt.

*Id.* ¶ 24. In reaching this conclusion, we were guided by the First Circuit's "observation that precise measurements may be unnecessary in some cases where the spatial leeway is relatively great and the gap in the chain of proof is relatively small." *Id.* (quotation marks omitted).

[¶31] In sum, we hold that 17-A M.R.S. § 1105-A(1)(E) requires proof beyond a reasonable doubt that the locus of the drug trafficker at the time of the offense be within 1,000 feet of the real property of a school, measured in a straight line and accounting for any difference in elevation between the two points. Additionally, in cases where the State fails to offer a precise measurement of the distance between the two points but the spatial leeway is great enough to make up for such evidentiary gaps, the jury reasonably may infer that the trafficking occurred within 1,000 feet of the school. The concept of spatial leeway does not excuse the State from proving the 1,000-foot

distance, however; it only recognizes that jurors are well-equipped in appropriate cases to apply their "common sense, common knowledge, and rough indices of distance" when facts proved beyond a reasonable doubt permit a jury to reasonably infer distances not precisely accounted for. *Barnard*, 2003 ME 79, ¶ 24, 828 A.2d 216 (quotation marks omitted).

E.    Application to this Case

[¶32]  Turning to the evidence in this case, which we view in the light most favorable to the State, *see Adams*, 2015 ME 30, ¶ 2, 113 A.3d 583, the DEA agent's testimony was sufficient to establish beyond a reasonable doubt the following measurements.  First, the distance between the "front step of 72 Walnut Street," which is at the Walnut Street entrance, and "four or five feet" onto the real property of Longley Elementary School amounts to 958.9 feet. Moreover, because the DEA agent testified that a terminus of his measurement was "four or five feet" past Longley Elementary School's property line, the jury could reasonably infer that the actual distance between the front step of 72 Walnut Street's front entrance and the real property line of Longley Elementary School was 953.9 feet.  *See Barnard*, 2003 ME 79, ¶ 23, 828 A.2d 216.  Second, the jury rationally could have found, based on the DEA agent's testimony about his additional measurements and from other testimony

regarding the layout of the apartment, that the distance between the "doorway that opens into the living room" from the Walnut Street entrance and the front step of 72 Walnut Street, where the initial measurement began, constitutes an additional 37.3 feet.  Therefore, based on the evidence presented at trial, the jury rationally could conclude that the distance between the "doorway that opens into the living room" and the real property line of Longley Elementary School was 991.2 feet.[10]  As a result, the evidence established, at a maximum, 8.8 feet of spatial leeway.

[¶33]  In an attempt to use the spatial leeway exception, the State contends that, because its measurements included a vertical distance using the method suggested in *Soler* and employed a pedestrian-route measurement rather than a straight-line route measurement, the jury could have reasonably inferred that the apartment was even closer to the school.  We are unpersuaded by this argument for two reasons.

[¶34]  First, because the difference in elevation between the school boundary line and the location of the trafficker at the time of the offense must

---

[10]  Again, this calculation comes from the 953.9-foot measurement conducted with the measuring wheel and accepting the DEA's agent's testimony that he went five feet past the property line, plus the three measurements conducted on the morning of the second day of trial, which totaled 37.3 feet. Together, these measurements equal 991.2 feet.

be accounted for in the measurement required by 17-A M.R.S. § 1105-A(1)(E), the vertical distance included in the State's measurement does not provide more spatial leeway that the jury could have applied in reasonably inferring that Brown trafficked within 1,000 feet of Longley Elementary School. Second, the State's argument that the jury could reasonably infer that a straight-line measurement would have provided even more spatial leeway that the jury could have applied in reasonably inferring that Brown was trafficking within 1,000 feet of Longley Elementary School is also unavailing. The DEA agent measured the distance from Longley Elementary School to 72 Walnut Street using a pedestrian-route measurement, and the State provided no "straight-line" measurement for the jury to consider. Therefore, there was *no evidence* from which the jury reasonably could have inferred that, if a straight-line measurement had been conducted, the distance would have been within 1,000 feet. *See Johnson*, 46 F.3d at 1169. Although common sense would dictate that a pedestrian-route measurement is necessarily longer than a straight-line measurement, it would be pure guesswork for a jury to determine *how much shorter* the straight-line measurement would have been. *See Applewhite*, 72 F.3d at 143 ("[T]here is no evidence in the record here from which the jury could have derived the shorter straight-line distance. The

Government's case must therefore stand or fall upon the adequacy of [the government's pedestrian-route measurement].").

[¶35] Because 8.8 feet of spatial leeway is very slight, "and [because] personal liberty is at stake, [we] must examine the [State's] proof with a more critical eye." *Soler*, 275 F.3d at 154. In doing so, we evaluate each count of aggravated trafficking and determine whether there was sufficient evidence to convict Brown of that count, applying the rule of lenity in the absence of any clear direction as to how to account for the difference in elevation between the school and the various transaction sites. *See Blum*, 2018 ME 78, ¶ 10 n.5, 187 A.3d 566; *Pinkham*, 2016 ME 59, ¶ 14, 137 A.3d 203.

1.    Count 1

[¶36] The confidential informant specifically testified that the first buy occurred at the doorway of the defendant's bedroom. However, with regard to Count 1, there is no evidence from which the jury could reasonably infer that the distance from the doorway of the living room to Brown's bedroom doorway is within the spatial leeway of 8.8 feet. The only evidence depicting the inside of the apartment building were several photographs of the inside of Brown's

24

bedroom[11] and several close shots of specific pieces of evidence found in the apartment. Although photographs may sometimes allow a jury to make a reasonable inference concerning distance, *see United States v. Harrison,* 103 F.3d 986, 990 (D.C. Cir. 1997),[12] that is not the case here.

[¶37] The First Circuit held in *Soler* that the jury could not have determined beyond a reasonable doubt that the vertical distance not accounted for in measurements was within 37 feet based on a videotape that was played several times. 275 F.3d at 154-55. As its reasoning, the First Circuit explained,

> Although the videotape was played several times for the jury, it was neither filmed with an eye toward elucidating relative distances nor introduced into evidence for that purpose. Moreover, it showed the relevant portion of the building fleetingly and as an incidental matter; the camera angles were distorted by the repeated use of a zoom lens; and the prosecutor did not even attempt to draw the jury's attention to the scale involved.

*Id*. at 155. Applying the same reasoning here, in light of the absence of evidence in the record demonstrating the size of the apartment, or even the size of the living room, the jury could not make a reasonable inference that the doorway

---

[11] These photographs are irrelevant for purposes of Count 1 because the transaction took place at the doorway of Brown's bedroom.

[12] Somewhat analogous to the aerial map used in *United States v. Harrison*, 103 F.3d 986, 990 (D.C. Cir. 1997), the State did offer in evidence a tax map that portrayed an aerial view of Longley Elementary School and some surrounding neighborhoods. However, the tax map *did not* include 72 Walnut Street. Therefore, the jury could not have relied upon the map's scale as an independent means of finding that the apartment building was within 1,000 feet of the school's location.

of Brown's bedroom was within 8.8 feet of the living room doorway. *See Goodson v. United States*, 760 A.2d 551, 554-55 (D.C. 2000).

2. Counts 2-3

[¶38] There is no specific evidence as to the exact location of the second and third controlled buys. The testimony elicited during trial demonstrated only that the controlled buys took place either in Brown's bedroom doorway or by an end table in the living room.[13] Because the State's 991.2-foot measurement extends only to the doorway of the living room, and the confidential informant testified that the drug transactions took place *beyond* that location, in either the doorway of Brown's bedroom or by an end table in the living room, there was no evidence that would permit the jury to reasonably infer that the drug transactions took place within the 8.8 feet of spatial leeway permitted by the evidence presented. *See Soler*, 275 F.3d at 154-55.

3. Count 4

[¶39] For the fourth count of aggravating trafficking, the State was required to prove that the location inside of Brown's bedroom where the drugs were discovered was within 1,000 feet of the school property. The only evidence presented to show—or even suggest—the distance from the living

---

[13] There is no evidence in the record regarding the location of the end table in the living room.

room doorway to the location inside Brown's bedroom where the drugs were found were the photographs showing where the drugs were found in Brown's bedroom. The photographs reveal a relatively significant distance between the doorway of Brown's bedroom and where the drugs were found by Brown's bed. Consequently, no jury rationally could find, based on the evidence presented, that the cocaine was located within 1,000 feet of Longley Elementary School.

[¶40]  As we acknowledged in *Barnard*, "'the government must prove beyond a reasonable doubt that the distance from a school to the actual site of the transaction, not merely to the curtilage or exterior wall of the structure in which the transaction takes place, is 1,000 feet or less.'"  2003 ME 79, ¶ 21, 828 A.2d 216 (quoting *Soler*, 275 F.3d at 154).  Here, unlike in *Barnard*, the DEA agent did not measure to the *farthest* point of the building from the school, which might have permitted the jury to find that "any location within the building was, necessarily, even closer to the school property." *Id.* ¶ 24.  Rather, the DEA agent measured only to the "doorway that opens into the living room" from the Walnut Street front entrance.

[¶41]  Given the absence of precise measurements of the distance from the doorway that opens into the living room to the doorway of Brown's bedroom, the living room end table, or the location where the drugs were found

in Brown's bedroom, and given the actual evidence and the limited utility of the "spatial leeway" principle, the jury could not have found, beyond a reasonable doubt, that any of Brown's trafficking took place within 1,000 feet of Longley Elementary School. *See Johnson*, 46 F.3d at 1169-70 (D.C. Cir. 1995) ("It is entirely possible—perhaps probable—that this is true. If so, we have no idea why the government did not prove it. . . . Since there is no evidence of either the straight line measurement or the distance between the terminal point of [the officer's] measurement and the point of possession, it is impossible to determine whether or not this equation is true."); *see also Soler*, 275 F.3d at 155 ("Although it is possible (indeed, probable) that the distance from the school to the site of the heroin sales was less than 1,000 feet, that is not good enough. The government must prove the elements of an offense beyond a reasonable doubt—and its proof here simply does not conform to that high standard." (footnote omitted)).

## III. CONCLUSION

[¶42] Accordingly, we vacate the aggravating elements of the convictions of Counts 1-4 and remand to the Superior Court for resentencing on four counts of trafficking in schedule W drugs (Class B). *See* 17-A M.R.S. § 1103(1-A)(A), (3)(B).

28

The entry is:

> Judgment vacated in part. Remanded for entry of modified judgment and resentencing on Counts 1-4.

---

SAUFLEY, C.J., with whom MEAD, J., joins, concurring.

[¶43] We concur completely in the Court's opinion. We write separately to draw attention to the broader consequences of the statute making drug trafficking an aggravated offense if the transaction occurs within 1,000 feet of the real property of a school. *See* 17-A M.R.S. § 1105-A(1)(E)(1) (2018).

[¶44] To be clear, the Legislature's adoption of a statute designed to keep school children from obtaining drugs, witnessing the sale of drugs, or being exposed to the violence that could arise during a drug transaction is laudable. Protecting our children from exposure to this pernicious activity and the presence of a culture that includes violence, misery, and death is a critically important legislative goal.

[¶45] The statute put in place to effectuate such goals, however, misses its mark. The case at bar is a perfect example of the unintended consequences of this blunt instrument. The drug sales at issue occurred in a private dwelling, outside the view of any children, youth, or participants in school activities. The

transactions had no connection to the school. Had the sales occurred in an apartment closer to the part of the building that was nearest to the school, rather than in the apartment at issue, the aggravating factor would likely have been proved, subjecting the defendant to a longer period of incarceration for each crime, even in the absence of *any* school involvement.

[¶46]  Worse than the arbitrary nature of this aggravating factor is the potential that it may disproportionately affect defendants in more densely populated geographic areas, where neighborhood schools are present throughout a municipality. The result could include a disparate racial or poverty-based impact that was unintended by the drafters. Meanwhile, in suburban or rural areas where much of the population resides more than 1,000 feet from school property, drug transactions between adults in private homes are significantly less likely to incidentally result in convictions of aggravated trafficking based on proximity to a school.

[¶47]  Although this challenge was not raised in the matter before the court, likely because challenges to similar laws based on assertions of constitutional infirmity have regularly been unsuccessful,[14] the fact that a law

---

[14] *See United States v. Holland*, 810 F.2d 1215, 1218-24 (D.C. Cir. 1987); *State v. Coria*, 839 P.2d 890, 894-901 (Wash. 1992); *cf. United States v. Falu*, 776 F.2d 46, 48-50 (2d Cir. 1985) (applying principles of statutory construction). The United States Court of Appeals for the Sixth Circuit observed: "The court [in *Falu*] concluded that Congress intended that dealers bear the burden of

30

meets minimal constitutional standards does not make it a good law. Hence, we raise this issue for consideration by the people's elected representatives.

[¶48] In short, although the noble goal of the statute is to protect schoolchildren from the ills of drug trafficking, the statute may disproportionately expose people living in diverse, urban areas to aggravated convictions and harsher sentences for conduct that may have no effect whatsoever on the schoolchildren the statute seeks to protect. A more descriptive definition of the activity to be proscribed would greatly enhance the justice of this aggravating factor, and we hope that the Maine Legislature will seriously consider the consequences of the provision as written.[15]

---

ascertaining where schools are located and removing their operations from those areas." *United States v. Cross*, 900 F.2d 66, 69 (6th Cir. 1990). "Similarly, in *Holland*, the D.C. Circuit stated that it would not be appropriate to apply the rule of lenity here, where the application would undercut the unambiguous legislative design of the section." *Id.* (quotation marks omitted). Based on *Falu and Holland*, the Sixth Circuit held that "the lack of knowledge of the proximity of a school does not violate due process." *Id.*

   [15] The Legislature may consider some of the language provided in a similar, although procedurally distinct, statute in New Jersey:

> It is an affirmative defense to prosecution for a violation of this section that *the prohibited conduct took place entirely within a private residence, that no person 17 years of age or younger was present in such private residence at any time during the commission of the offense*, and that the prohibited conduct did not involve distributing, dispensing or possessing with the intent to distribute or dispense any controlled dangerous substance or controlled substance analog for profit. The affirmative defense established in this section shall be proved by the defendant by a preponderance of the evidence. Nothing herein shall be construed to establish an affirmative defense with respect to a prosecution for an offense defined in any other section of this chapter.

Rory A. McNamara, Esq. (orally), Drake Law, LLC, Berwick, for appellant David T. Brown

Janet T. Mills, Attorney General, and Johanna L. Gauvreau, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket number CR-2017-472
FOR CLERK REFERENCE ONLY

N.J. Stat. Ann. § 2C:35-7(e) (LEXIS through 2018 Second Annual Sess.) (emphasis added).